540 S.E.2d 851

The STATE, Respondent,

v.

William Arthur KELLY, Appellant.

No. 25226.

Supreme Court of South Carolina.

Heard Sept. 20, 2000.

Decided Jan. 8, 2001.

---

4. Because certiorari was granted only on this issue, petitioner's other convictions are unaffected.

352

Assistant Appellate Defender Robert M. Dudek of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for respondent.

WALLER, Justice.

A jury convicted appellant William Kelly of murder, kidnapping, armed robbery, and possession of a knife during the commission of a violent crime. Kelly was sentenced to death for murder, thirty years consecutive for armed robbery, and five years consecutive for possession of a knife during the commission of a violent crime. This case consolidates his direct appeal with the mandatory review provisions of S.C.Code Ann. § 16–3–25 (1985). We affirm.

## FACTS

On the night of January 5, 1996, police officer Stephen Clare drove by the Batesburg KFC and noticed in the parking lot a car running with the driver's door open. Knowing that it was after the restaurant's usual closing time and recognizing the car as belonging to Shirley Shealy, the manager of the KFC, Officer Clare pulled in to investigate. Officer Clare discovered Shealy's body in the KFC; her hands were taped behind her back, and money was strewn all over the floor and stuck to her bloody body.

Kelly, a former KFC employee, had visited the KFC earlier that day. After interviewing KFC employees, Batesburg–Leesville Chief of Police William Oswald attempted to locate Kelly. On January 8, 1996, Kelly's mother called Chief Oswald and told him that Kelly was in Lowell, Massachusetts. Lowell police detectives found Kelly at his sister's residence in

Lowell. Kelly, who was seventeen years old at the time, was advised of his *Miranda*[1] rights and made a statement to the detectives admitting that he killed Shealy and stole money from the KFC. Kelly had in his possession money stained with Shealy's blood. In addition, the Lowell detectives retrieved Kelly's bloodstained clothing from his car.

Kelly was indicted for murder, kidnapping, armed robbery, and possession of a knife during the commission of a violent crime. At trial, the forensic pathologist who performed the autopsy testified that Shealy was stabbed thirty-one times and her neck was cut from ear to ear. She bled to death. At the time of her death, Shealy was 23 weeks pregnant. The jury convicted Kelly on all charges.

In the sentencing phase, the trial court instructed the jury on five statutory aggravating circumstances, to wit, that the murder was committed while in the commission of: (1) kidnapping; (2) burglary; (3) robbery while armed with a deadly weapon; (4) larceny with use of a deadly weapon; and (5) physical torture. *See* S.C.Code Ann. § 16–3–20(C) (Supp. 1999). The jury was charged on three statutory mitigating circumstances: (1) the defendant had no significant history of prior criminal conviction involving the use of violence against another person; (2) the age of the defendant at the time of the crime; and (3) the defendant was below the age of eighteen at the time of the crime. *Id.* The jury found all five aggravating circumstances and recommended the death penalty. Accordingly, the trial court imposed a sentence of death for the murder conviction.

### ISSUES

1. Did the trial court err by refusing to redact from Kelly's statement references to Shealy's pregnancy?

2. Did the trial court err by refusing to charge the jury on parole ineligibility?

3. Did the trial court err by refusing to charge the jury that future dangerousness was not at issue?

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Was the testimony of Matthew McCormack improperly bolstered by the State?

5. Did the trial court err by allowing testimony from Shealy's sister about statements made by Shealy's son?

## 1. FAILURE TO REDACT REFERENCES TO VICTIM'S PREGNANCY

Kelly raises only one issue regarding the guilt phase of his trial. He argues that the trial court erred by not redacting from his confession references to Shealy's pregnancy. We disagree.

Kelly gave the Lowell police a written statement which the State introduced at trial. In his statement, Kelly confessed to slitting Shealy's throat and stabbing her repeatedly. Basically, Kelly's explanation for why he killed Shealy was that his attack was in response to Shealy's request for sex. He stated that while he worked at the KFC, Shealy would "always" proposition him sexually. Kelly stated that on January 5, 1996, he went to the KFC after closing time and saw Shealy in the office. According to Kelly, Shealy again propositioned him for sex, grabbed him, and asked him not to leave. He stated that he duct-taped Shealy's hands behind her back so she would not touch him. Kelly said that as he went to leave, Shealy got her hands free, grabbed him and started hitting him. Kelly stated that he then took out his knife, slit her throat and continued to stab her while she kept grabbing at him. Kelly told the Lowell police that Shealy then fell to the floor and was gasping for air. To keep her from getting up, Kelly said that he again taped her hands behind her back.

Kelly made two references to Shealy's pregnancy in his statement. First, he stated that he "did know that Shirley was pregnant." Second, Kelly stated that Shealy asked him "to stay and have sex with her" and that she told him "since she was pregnant already" he could not get her pregnant if they had sex.

At the outset of the guilt phase, Kelly moved to exclude any evidence that Shealy was pregnant. The State informed the trial court that it planned on introducing Kelly's statement which, as detailed above, included references to the pregnan-

cy. Kelly then moved to redact those references. The trial court denied the motion. With the exception of Kelly's statement, the State did not introduce any evidence about Shealy's pregnancy during the guilt phase of the trial. Kelly presented no witnesses in his defense. At Kelly's request, the jury was instructed on voluntary manslaughter.

In the State's guilt phase closing argument, Shealy's pregnancy was mentioned twice without objection. The State argued that Kelly had "the perfect victim. He's got a pregnant lady. Is she going to do what he says? Yes, ma'am. Yes, sir." The State noted the pathologist's testimony that there were no defensive wounds and no blood on Shealy's hands. The State therefore argued that Kelly's statement that Shealy's hands were free during the attack was not credible. Specifically, the State argued that if her hands were free, "What is she going to do? She's going to be covering up. She's going to be trying to avoid it. She's pregnant."

Kelly contends that the trial court should have redacted his statement to remove the references to Shealy's pregnancy because the evidence was not relevant, or, alternatively, the probative value of this evidence was outweighed by its unfairly prejudicial impact. We disagree.

 Evidence is relevant and admissible if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rules 401, 402, SCRE. Nevertheless, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE. Unfair prejudice means an undue tendency to suggest decision on an improper basis, such as an emotional one. *State v. Alexander*, 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991) (citation omitted). The trial court is given broad discretion in ruling on questions concerning the relevancy of evidence, and its decision will be reversed only if there is a clear abuse of discretion. *Id.* at 380, 401 S.E.2d at 148.

 The jury was instructed on both murder and voluntary manslaughter.[2] Thus, there was an issue on the presence

---

**2.** Murder is "the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10 (1985). Voluntary

or absence of malice. *See State v. Gandy,* 283 S.C. 571, 573, 324 S.E.2d 65, 66–67 (1984) (voluntary manslaughter is distinguished from murder because "the vital element of malice is missing") *implicitly overruled on other grounds by Casey v. State,* 305 S.C. 445, 409 S.E.2d 391 (1991); S.C.Code Ann. §§ 16–3–10, 16–3–50 (1985 & Supp.1999). " 'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." *State v. Kelsey,* 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998).

We believe the evidence of Shealy's pregnancy was relevant to the issue of intent, i.e., whether Kelly acted with malice. The State's theory of the case was that Kelly planned his crimes.[3] Because Kelly knew Shealy was pregnant, and thus, particularly vulnerable, the jury could infer that Kelly had consciously selected a "perfect victim." Such evidence of planning certainly negates voluntary manslaughter which requires a showing of provocation. Additionally, although the evidence of Shealy's pregnancy came directly from Kelly's own statement, this evidence tended to refute Kelly's version of how the attack occurred. Therefore, Kelly's references to the pregnancy made it less probable that he committed voluntary manslaughter. *See* Rule 401, SCRE. Moreover, the fact that Kelly killed a pregnant woman, in our opinion, "indicates a wicked or depraved spirit intent on doing wrong." *State v. Kelsey, supra.* The evidence was, therefore, probative on the issue of whether Kelly acted with malice.

Kelly argues that this evidence undeniably had an emotional impact on the jury, and thus should have been excluded because it was unfairly prejudicial. As discussed above, the evidence was relevant to the only real issue in the guilt phase-the presence or absence of malice. Accordingly, we believe the probative value of the evidence outweighed its prejudicial

manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *E.g., State v. Johnson,* 333 S.C. 62, 508 S.E.2d 29 (1998); *see also* S.C.Code Ann. § 16–3–50 (1985) (manslaughter is "the unlawful killing of another without malice").

**3.** For example, the State established that the type of latex gloves and duct tape used in the attack were not used by the KFC and that they were used at the McDonald's where, at the time of his crimes, Kelly was working as a cook.

effect. *Compare State v. Garner*, 304 S.C. 220, 403 S.E.2d 631 (1991) (prejudicial effect of evidence of other crimes outweighs its probative value when purpose for which it is admitted is *not* a contested issue) *with State v. Simmons*, 310 S.C. 439, 427 S.E.2d 175 (1993) (probative value of other-crimes evidence outweighed its prejudicial effect where the issue of intent was a contested one), *reversed on other grounds by Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).[4]

We hold that the trial court did not abuse its discretion in admitting evidence of Shealy's pregnancy in the guilt phase. *State v. Alexander, supra.* Accordingly, Kelly's convictions are affirmed.

## 2. REFUSAL TO GIVE PAROLE INELIGIBILITY INSTRUCTION

Kelly argues that the trial court erred in the sentencing phase when it refused to instruct the jury that he would be ineligible for parole if sentenced to life. Kelly contends that since the State presented evidence of Kelly's future dangerousness, due process and *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), required the parole ineligibility charge. We hold that *Simmons* does not apply to this case, and therefore, the trial court correctly declined to give the instruction.

In the sentencing phase, the State presented several witnesses who testified about Kelly's actions while he was incarcerated at the Lexington County Detention Center. The jail administrator testified that an attempted escape charge had been filed against Kelly because a mortar joint around a cinder block in his cell had been gouged out.[5] Matthew

---

4. Additionally, we note that the manner in which the evidence was introduced minimized its prejudicial effect. The State did not elicit testimony about Shealy's pregnancy from any witness in the guilt phase. The only evidence admitted on the fact came in through Kelly's statement. Likewise, in the State's guilt phase closing argument, Shealy's pregnancy was mentioned only twice.

5. On cross-examination, Kelly emphasized he was only one of three inmates housed in that cell and it had not been proven he was the one who actually had dug out the mortar around the cinder block.

McCormack, who had twice been Kelly's cellmate at the jail, testified that he and Kelly often spoke of escaping and that Kelly had, at one point, taken action on an escape plan. McCormack stated that Kelly made a shank and planned to take a female correctional officer hostage. Although Kelly called the correctional officer to their cell, McCormack stated that Kelly backed out of going through with the plan. The State also questioned correctional officer Mark Wharton who testified that he discovered a shank in Kelly's possession. Finally, Edward Bryant, who had been in jail with Kelly, testified that he heard Kelly talk about escape. In addition, Bryant testified that Kelly bragged about his crime, requested that he be called "KFC," and walked around with a cup which had a drawing of a chicken with its head cut off and a knife on it.

At the conclusion of the sentencing phase, Kelly requested the following jury charge:

I charge you that the term "life imprisonment" means imprisonment until the death of the offender. No person sentenced to life imprisonment is eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by law.

*See* S.C.Code Ann. § 16–3–20 (Supp.1999). The State objected to the charge and stated that because it was not going to argue future dangerousness, the charge was not required by *Simmons.* Ruling that the State's evidence went to Kelly's character and characteristics and not to future dangerousness, the trial court denied the request to charge.[6]

In closing argument, the State argued that the death penalty was "the punishment that fits the crime." The State argued that Kelly had planned his crime and that he was a "master murderer." Because Kelly had no prior record, the State argued that a person who commits "an unpredictable crime is more frightening than a serial killer, more frightening than a career criminal.... You kind of trust them a little bit." Further, the State argued that Kelly was intelligent, quick-witted and did not have any mental illness. Thus, the State argued that made Kelly "a little more dangerous ... for this

---

6. The jury was given a plain meaning charge.

lady, this crime on January the 5th, doesn't that make him more unpredictable for Shirley Shealy." Finally, the State recounted, over objection, the evidence regarding Kelly's attempted escapes from jail and that he had a shank. The State then argued that "murderers will be murderers. And he is the cold-blooded one right over there."

On appeal, Kelly contends that: (1) the State's evidence about escape attempts, possession of a shank, and his behavior in jail raised the issue of future dangerousness; (2) the State argued future dangerousness in its closing; and therefore, (3) the trial court erred in refusing to charge the jury regarding Kelly's parole ineligibility. Kelly argues he was denied due process because the jury instruction was mandated by *Simmons.*

In *Simmons,* a plurality of the United States Supreme Court held that when a capital defendant would be ineligible for parole if sentenced to life in prison and the State argues the defendant's future dangerousness as a basis for imposing the death penalty, the defendant is entitled to have the jury informed of his parole ineligibility through either defense argument or instruction by the trial judge. *Simmons, supra.*[7] The *Simmons* Court explained that the "Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Id.* at 161, 114 S.Ct. at 2192, 129 L.Ed.2d at 141 (quoting *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393, 404 (1977)). Thus, the Court ruled that the "State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id.* at 171, 114 S.Ct. at 2198, 129 L.Ed.2d at 147.

■ To be entitled to a *Simmons* charge, two prongs must be met. First, the State must put the defendant's future

---

7. Shortly after *Simmons* was decided, this Court held that the trial judge *must* charge a capital defendant's parole ineligibility when future dangerousness is at issue and either the defendant requests such a charge or the jury inquires about the meaning of "life imprisonment." *State v. Southerland,* 316 S.C. 377, 387, 447 S.E.2d 862, 868 (1994), *cert. denied,* 513 U.S. 1166, 115 S.Ct. 1136, 130 L.Ed.2d 1096 (1995), *overruled on other grounds State v. Chapman,* 317 S.C. 302, 454 S.E.2d 317 (1995).

dangerousness in issue. Second, the only available alternative sentence to death is life imprisonment without possibility of parole. *Id.* at 178, 114 S.Ct. at 2201, 129 L.Ed.2d at 151 (O'Connor, J., concurring); *see also State v. McWee*, 322 S.C. 387, 391–92, 472 S.E.2d 235, 238 (1996), *cert. denied*, 519 U.S. 1061, 117 S.Ct. 695, 136 L.Ed.2d 618 (1997) (due process requires parole ineligibility charge "only if appellant's future dangerousness was an issue and only if appellant would have been ineligible for parole upon the imposition of a life sentence"). Kelly has not met either prong of the *Simmons* test.

 ▐▌ First, we agree with the trial court that the State's evidence at sentencing did not implicate future dangerousness. Evidence that Kelly took part in escape attempts and carried a shank simply is not the type of future dangerousness evidence contemplated by *Simmons*.[8] The underlying principle of the *Simmons* holding is that if evidence of future dangerousness is presented by the State, the defendant must be allowed to *rebut* this evidence by showing that he will never be eligible for parole, i.e., that he will never *legally* be let out of prison. In the instant case, however, Kelly argues that the evidence he is an escape threat (and thus a risk to the general public) required that the jury be instructed on parole ineligibility. The flaw in Kelly's argument is that a *Simmons* charge would not rebut this evidence. Telling a jury that a convicted murderer will never be eligible for parole simply does not respond to the State's evidence that he presents an escape risk.

In our opinion, the evidence presented by the State in the penalty phase was designed to show that Kelly would not adapt to prison life because in jail he had been caught carrying a weapon and planning or participating in escape attempts. Kelly was allowed to rebut this evidence, through both cross-examination of the State's witnesses and the witnesses presented in his defense.[9] Thus, Kelly was given the

---

8. When the State argues future dangerousness, it "urge[s] the jury to sentence the defendant to death so that he will not be a danger to the public *if released* from prison." *Simmons*, 512 U.S. at 163, 114 S.Ct. at 2193, 129 L.Ed.2d at 142 (emphasis added).

9. Kelly presented expert testimony from a clinical psychologist, Dr. Steven Shea, and a correctional management consultant, James Aiken.

opportunity to deny or explain the State's evidence, in accordance with due process requirements.

Kelly further contends that the State argued future dangerousness to the jury and thus misled the jury in violation of his due process rights. Specifically, Kelly argues that the State's argument that Kelly is worse than a serial killer and that "murderers will be murderers" constituted argument on future dangerousness. We disagree. A fair reading of the State's closing argument shows that the State consciously avoided any implication of future dangerousness. Not once did the State suggest to the jury that it should impose the death penalty because Kelly would be a future danger to the general public. *Cf. Simmons, supra* (where the Court found the following arguments to be generalized argument of future dangerousness: "what to do with [petitioner] now that he is in our midst" and that the death penalty would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense"). Instead, the State argued Kelly should be given the death penalty primarily as retribution for the heinous nature of the murder and because of the status of Shealy, the pregnant victim.

We hold that future dangerousness was not an issue in this case. It was neither a logical inference from the evidence nor was it injected into the case through the State's closing argument.

Additionally, the second prong of the *Simmons* test was not met. The *Simmons* rule is applicable when the only alternative to a death sentence is life imprisonment without parole. *See Simmons,* 512 U.S. at 178, 114 S.Ct. at 2201, 129 L.Ed.2d at 151 (O'Connor, J., concurring); *State v. McWee,* 322 S.C. at 391–92, 472 S.E.2d at 238. Because Kelly was tried under the new sentencing scheme which became effective on January 1, 1996, he could have been sentenced to either (1) death; (2) life without the possibility of parole; or (3) a mandatory minimum thirty year sentence. *See* S.C.Code Ann. § 16–3–20 (Supp. 1999). The mandatory minimum sentence of thirty years is

---

Dr. Shea testified that Kelly could adjust to prison. Aiken testified that Kelly could be "adequately managed, housed and secured without endangerment in a correctional facility within the South Carolina Department of Corrections."

available only if the jury returns with no finding of aggravating circumstances. *Id.*

This Court recently held that *Simmons* is inapplicable under the new sentencing scheme because life without the possibility of parole is not the only legally available sentence alternative to death. *State v. Starnes*, 340 S.C. 312, 531 S.E.2d 907 (2000); *State v. Shafer*, 340 S.C. 291, 531 S.E.2d 524 (2000), *cert. granted*, 530 U.S. 1306, 121 S.Ct. 30, 147 L.Ed.2d 1053 (2000). The logic behind this holding is that a *Simmons* charge is designed to answer the State's evidence that the defendant will be a future danger to society by telling the jury that if sentenced to life in prison, the defendant will never be paroled. In other words, a *Simmons* charge informs the jury that by rejecting the death penalty, the defendant will spend the rest of his natural life in prison. However, if another sentence other than life without parole is available to the defendant as an alternative to the death penalty, then a *Simmons* charge would actually mislead the jury by representing that the defendant would never be released from prison, when in fact, a thirty-year sentence is a potential sentence for the defendant. *See Starnes*, 340 S.C. at 329, 531 S.E.2d at 916 ("Contrary to a sentence of life imprisonment without parole, a mandatory minimum thirty year sentence does not rebut the State's argument regarding the defendant's threat to society."). Accordingly, *Simmons* should not, and does not, apply when *as a matter of law* another sentence other than death or life without parole is available to a capital defendant.[10]

Nonetheless, Kelly contends that the thirty-year minimum sentence was not available to him because the jury would have violated its oath if it had not found at least one aggrava-

---

**10.** We note that the second prong of the *Simmons* test may be satisfied under certain circumstances. For example, if the recidivist statute is applied, there will be no third alternative sentence as a matter of law. *See* S.C.Code Ann. § 17–25–45 (Supp.1999) (imposing mandatory sentence of life imprisonment without parole where defendant has prior convictions of a most serious nature). If section 17–25–45 is invoked and future dangerousness is argued, *Simmons* is applicable because the only available sentences are life without parole or death. In the instant case, however, Kelly had no previous convictions, and therefore, section 17–25–45 does not affect our analysis of this issue.

ting circumstance. Thus, Kelly argues that *Simmons* applies to the instant case. In *Starnes*, however, we stated that it is "inappropriate to assume the jury will find a statutory aggravating circumstance." *Id.* at 330, 531 S.E.2d at 917. Although we granted Kelly's motion to argue against the recent precedent set in *Starnes* and *Shafer*, we adhere to that precedent and hold it is not appropriate to presume that in certain cases a jury will always find particular statutory aggravating circumstances. *Cf. State v. Riddle*, 301 S.C. 68, 71, 389 S.E.2d 665, 667 (1990) (where this Court found error in submitting to resentencing jury convictions from previous trial as evidence of aggravating circumstances; the Court stated that the convictions from the guilt phase were not "binding upon the resentencing jury" as it was the sentencing "jury's responsibility to find the existence, *or not*, of a statutory aggravating circumstance") (emphasis added). Therefore, Kelly cannot satisfy the second prong of the *Simmons* test.

We hold the trial court correctly refused to give the jury a *Simmons* charge.[11]

## 3. REFUSAL TO CHARGE THAT FUTURE DANGEROUSNESS WAS NOT AT ISSUE

After his request on the parole ineligibility charge was denied, Kelly requested the following jury charge:

11. Kelly also contends that the requested instruction was required because of James Aiken's testimony regarding good time credits. Aiken, Kelly's expert witness on prison management, testified on direct examination that prisoners may be sanctioned for disciplinary infractions by "taking good time away." On cross-examination, the State questioned Aiken further, and Aiken stated that he was speaking hypothetically, not about this particular case.

Kelly argues that the testimony about good time credits raised the inference that he would be released from prison, and therefore, he should have been able to rebut the evidence with the parole ineligibility charge. We believe Kelly's contention is without merit. Aiken's testimony merely discussed, in general terms, internal prison procedures for dealing with disciplinary violations committed by inmates. Kelly was not denied the opportunity to rebut this evidence; therefore, his due process rights were not compromised. Moreover, we note his own counsel elicited this testimony on direct examination. *State v. Washington*, 315 S.C. 108, 110, 432 S.E.2d 448, 449 (1992) (appellant may not complain about the admission of evidence elicited by his own counsel).

> I have instructed you on the "aggravating" factors that you may consider as reasons to impose the death penalty. I tell you now that you may not consider, as a reason to impose the death penalty, any possibility that the defendant may be dangerous in the future unless he is executed. In this case, there is no evidence that the defendant will be dangerous if he does not receive the death penalty but is instead sentenced to life imprisonment. The state does not contend that he will be dangerous in the future. Therefore, any consideration about future dangerousness is not a legal factor for you to consider as a reason to sentence the defendant to death. This subject may not be considered by you at all in deciding whether the death penalty should be imposed, and should not even be mentioned by you during you deliberations as to the sentence to be imposed.
>
> At the same time, you should understand that your consideration of reasons not to impose the death penalty is unlimited. Thus, if you find from the evidence that the defendant's future behavior is likely to be good, that would be a proper factor for you to consider as a reason to sentence him to life imprisonment rather than the death penalty.

Because the State agreed not to argue future dangerousness, Kelly maintains that the trial court erred in failing to give the charge. We disagree.

 "The purpose of instructions is to enlighten the jury and to aid it in arriving at a correct verdict." *State v. Leonard*, 292 S.C. 133, 137, 355 S.E.2d 270, 273 (1987). The law to be charged to the jury is determined by the evidence presented at trial. *E.g., State v. Lee*, 298 S.C. 362, 380 S.E.2d 834 (1989). Furthermore, a trial court should not give jury instructions which do not fit the facts of the case as such charges may tend to confuse the jury. *Id.; see also State v. Leonard, supra* (a trial court commits error when it provides instructions which are calculated to confuse or mislead the jury).

 We hold that the trial court correctly denied the requested charge because the evidence did not support the charge as written. The State is permitted to argue that a capital defendant might pose a future danger to those within

prison. This type of evidence and argument is distinguishable from what is considered "future dangerousness" under *Simmons*, i.e., a future danger to society. *Cf. State v. Rogers*, 320 S.C. 520, 466 S.E.2d 360 (1996) (where the Court indicated that if prosecution had argued only that defendant posed a danger to other prison inmates, and had not included danger to society argument, then *Simmons* would not apply); *Allridge v. Scott*, 41 F.3d 213 (5th Cir.1994), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995) (where the court noted that *Simmons* is inapplicable where the State argues that the defendant poses a danger to everybody, including fellow inmates) (citing *Simmons*, 512 U.S. at 165 n. 5, 114 S.Ct. at 2194 n. 5). Therefore, the requested charge was clearly incorrect because it instructed the jury "there is no evidence that the defendant will be dangerous if he does not receive the death penalty but is instead sentenced to life imprisonment." This charge thus would have precluded the jury from considering evidence of Kelly's future danger to others within prison, evidence which was clearly presented by the State and appropriate for the jury to consider.

Moreover, the charge as written is extremely confusing. It simply would not have aided the jury in making its sentencing determination. *State v. Leonard, supra.*

Accordingly, the trial court did not err by denying this request to charge.

### 4. BOLSTERING OF STATE'S WITNESS

Kelly argues that the State improperly bolstered Matthew McCormack's testimony thereby impermissibly vouching for McCormack's credibility. We agree.

As recounted above in Issue 2, McCormack had been Kelly's cellmate. McCormack testified about Kelly making a shank and how he said he was going to use it to abduct a female correctional officer. In addition, McCormack testified that Kelly had frequently spoken about his crimes. McCormack stated that Kelly told him that he and Shealy had planned to rob the KFC but that Shealy had turned on him during the robbery. McCormack testified that Kelly told him that he came up behind Shealy and cut her throat and had tried to decapitate her.

Toward the end of McCormack's direct examination, the following colloquy took place:

[Assistant Solicitor]: What did I tell you that I absolutely required regarding your testimony to this jury today?

[McCormack]: Uh—excuse me?

[Assistant Solicitor]: Did I tell you to tell the truth to this jury—

[McCormack]: Of course.

At that point, Kelly objected on the grounds that the assistant solicitor was bolstering the witness's testimony and was making himself a witness. After the trial court overruled the objection, the assistant solicitor continued:

[Assistant Solicitor]: What did I tell you regarding your testimony to this jury today? The only thing the State wanted from your testimony was what?

[McCormack]: The truth.

On cross-examination, Kelly questioned McCormack about his prior criminal record which included grand larceny, burglary and forgery convictions. Kelly also elicited testimony from McCormack, who was a federal inmate, regarding how in the federal system an inmate could get a sentence reduction if he provides helpful testimony to the government. McCormack acknowledged that the potential for a sentence reduction was "one of [his] main reasons for" testifying against Kelly.

██ Kelly argues that the State's questioning impermissibly bolstered McCormack's credibility because it placed the prestige of the government behind McCormack, a jailhouse informant. Kelly also maintains that the assistant solicitor effectively became a witness in the case and vouched for McCormack's credibility.

In *United States v. Walker*, 155 F.3d 180 (3d Cir.1998), the Court of Appeals for the Third Circuit discussed generally the concept of vouching:

Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury.... A prosecutor's vouching for the credibility of a government witness raises two concerns: (1) such comments can convey the impression that evidence

not presented to the jury but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. *Id.* at 184 (citations omitted).

Typically, vouching occurs when the prosecution comments on a witness's credibility in its opening statement or closing argument. *See id.* at 185–87 (discussion of Third Circuit case law on vouching). In the instant case, however, Kelly's argument is targeted at the State's questioning of McCormack. At least one court has held that this type of questioning is improper. *See Mitchell v. State,* 549 P.2d 96 (Okla.App.1976) (where the prosecutor asked witness whether they had "talked about this case" and witness responded "Yes, sir. You instructed me to tell the truth," the court found improper bolstering).

In our opinion, the State's questions served to improperly bolster McCormack's credibility. *Id.* Although perhaps not technically vouching, the manner of questioning [12] by the State raises the second concern outlined by the *Walker* court: the jury could have perceived that the assistant solicitor held the opinion that McCormack was, in fact, telling the truth. Thus, McCormack's testimony carried with it the imprimatur of the government, and this bolstering may have induced the jury to trust the State's judgment about McCormack. Because a jury must make its own assessment on the credibility of witnesses, it is inappropriate for the State to assure the jury of a government witness's credibility. Accordingly, the trial court erred in overruling Kelly's objection.

Nevertheless, we believe that this error was harmless beyond a reasonable doubt. *See State v. Gaskins,* 284 S.C. 105,

---

12. Although the assistant solicitor did not comment that he had personal knowledge McCormack was telling the truth or had outside evidence indicating the truthfulness of McCormack's testimony, the assistant solicitor improperly phrased his questions in the first person. ("What did *I* tell you *that I absolutely required* regarding your testimony to this jury today?" and "Did *I* tell you to tell the truth to this jury?") (emphasis added).

127, 326 S.E.2d 132, 145 (erroneous admission of evidence in sentencing phase reviewed for harmless error), *cert. denied,* 471 U.S. 1120, 105 S.Ct. 2368, 86 L.Ed.2d 266 (1985), *overruled in part on other grounds State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991). In our opinion, Kelly's cross-examination effectively impeached McCormack's credibility by eliciting information about his motive for testifying. Moreover, given the overwhelming evidence of aggravation in this case, we do not believe that the State's bolstering of McCormack materially influenced the jury's decision to impose the death penalty.

Accordingly, because the error was harmless, Kelly is not entitled to resentencing on this issue.

## 5. TESTIMONY FROM VICTIM'S SISTER

Kelly argues that the trial court erroneously admitted hearsay testimony from Shealy's sister Cynthia Slade. We disagree.

During the sentencing phase, the State called Slade who presented victim impact testimony. The State questioned Slade about Shealy's son Alex, who was six years old when Shealy was killed:

[Solicitor]: Have you seen Alex since his mother was murdered?

[Slade]: Yes, sir.

[Solicitor]: Has there been a change in him?

[Slade]: Oh, yeah.

[Solicitor]: Does he talk about it?

[Slade]: Yeah. He talks about it a lot [sic]. We were at a wedding and he told basically everybody—

Kelly's attorney objected on the basis of hearsay. The trial court overruled the objection. When the State asked what Alex had said, Slade responded:

He told everybody in the—at the wedding that a bad man had killed his mommy.

Kelly argues Slade's testimony that Alex said "a bad man had killed his mommy" was impermissible hearsay and should have been excluded.

The South Carolina Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. By that definition, we believe Slade's testimony was not hearsay because it was not offered to prove the truth of the matter asserted. That is, the evidence was not introduced to prove that a bad man killed Shealy. Instead, the testimony clearly was offered to show the impact the murder had on Shealy's young child and the rest of her family. As such, it was properly offered as victim impact evidence. *See, e.g., State v. Byram,* 326 S.C. 107, 485 S.E.2d 360 (1997) (victim's sister's testimony about the effect of the victim's death upon herself and the victim's three children was relevant for the jury to meaningfully assess appellant's moral culpability and blameworthiness).

Accordingly, the trial court correctly allowed this evidence to be admitted.

Kelly's remaining issue [13] is affirmed pursuant to Rule 220(b)(2) and the following authorities: *State v. Johnson,* 338 S.C. 114, 525 S.E.2d 519, *cert. denied,* —— U.S. ——, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) (autopsy photograph may be relevant to showing physical torture); *State v. Ard,* 332 S.C. 370, 505 S.E.2d 328 (1998) (the determination of the relevancy, materiality, and admissibility of a photograph is left to the sound discretion of the trial judge); *State v. Kornahrens,* 290 S.C. 281, 350 S.E.2d 180 (1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987) (photographs which depict the bodies of the murder victims in substantially the same condition in which the defendant left them are admissible in sentencing phase of capital trial).

## CONCLUSION

Kelly's convictions and sentences are affirmed. We have conducted the proportionality review required by S.C.Code

---

**13.** Kelly argues that the trial court erred in admitting two of the State's photographic exhibits. As to Exhibit 116, an autopsy photograph, we note Kelly maintains that the exhibit "shows the fetus in the decedent's stomach." On the contrary, it is clear from both the photograph and the testimony at trial that this exhibit depicts Shealy's gaping neck wound.

Ann. § 16–3–25(C) (1985). The death sentence in this case is proportionate to that in similar cases and is neither excessive nor disproportionate to the crime. *State v. Ard,* 332 S.C. 370, 505 S.E.2d 328 (1998); *State v. Hicks,* 330 S.C. 207, 499 S.E.2d 209, *cert. denied,* 525 U.S. 1022, 119 S.Ct. 552, 142 L.Ed.2d 459 (1998); *State v. Powers,* 331 S.C. 37, 501 S.E.2d 116, *cert. denied,* 525 U.S. 1043, 119 S.Ct. 597, 142 L.Ed.2d 539 (1998).

**AFFIRMED.**

TOAL, C.J., MOORE and BURNETT, JJ., concur.

PLEICONES, J., dissenting and concurring in part in a separate opinion.

PLEICONES, Justice, dissenting and concurring.

I concur in the majority opinion with the exception of that portion which affirms the trial judge's refusal to give the requested parole ineligibility instruction. I would, therefore, affirm the convictions of the appellant, and reverse and remand for a new sentencing proceeding. It is my view that a *per se* rule should be adopted, requiring that, when requested, a parole ineligibility instruction be given to the jury deciding sentencing in a capital case.

In this case, appellant requested the following charge at the end of the sentencing phase:

I charge you that the term "life imprisonment" means imprisonment until the death of the offender. No person sentenced to life imprisonment is eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by law.

The majority affirms the trial judge's denial of this legally correct charge which is taken virtually verbatim from S.C.Code Ann. § 16–3–20(A) (Supp.1999). The majority relies upon our decisions in *State v. Starnes,* 340 S.C. 312, 531 S.E.2d 907 (2000), and *State v. Shafer,* 340 S.C. 291, 531 S.E.2d 524 (2000),[1] which hold that most capital defendants in

---

1. Appellant was granted permission to argue against these precedents. The United States Supreme Court has granted certiorari in *Shafer, supra,* 530 U.S. 1306, 121 S.Ct. 30, 147 L.Ed.2d 1053 (2000).

South Carolina are no longer entitled to a parole ineligibility charge under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). Under *State v. Starnes, supra,* and *State v. Shafer, supra, Simmons* did not apply because appellant would not necessarily have received a sentence of life imprisonment had the jury failed to find a statutory aggravating circumstance.[2] Appellant, as the majority points out, could have received a mandatory minimum sentence of at least thirty years without the possibility of parole.

Further, the majority adheres to this Court's recent ruling in *State v. Starnes, supra,* that it is inappropriate to presume that juries will always find the existence of aggravating circumstance.

I propose a rule that is not dependent upon the shifting grounds of constitutional interpretation, is simple to apply, and has the result of fully informing the jury of its options. We have taken great pains to advise the jury that it is the final sentencing authority in a capital case.[3] That being the case, the jury should be equipped with the same knowledge in terms of sentencing as a sentencing judge. In my opinion, we should take this opportunity to clarify and simplify the rule for charging capital juries on the defendant's ineligibility for parole or early release.

Under our current capital sentencing scheme, if the defendant has been previously convicted of a "serious" or "most serious" offense[4] he faces only two possible sentences: death, or life imprisonment without possibility of parole. S.C.Code Ann. § 17–25–45 (Supp.1999).

If the defendant has not been previously convicted of a "serious" or "most serious" offense, the potential sentences

---

**2.** Appellant had no previous convictions of either "serious" or "most serious" offenses. *See* S.C.Code Ann. § 17–25–45 (Supp.1999) (defining these offenses).

**3.** A trial judge must, of course, still make an affirmative finding that the death penalty was warranted under the evidence, and that it was not the result of passion, prejudice, caprice, or any other arbitrary factor. S.C.Code Ann. § 16–3–20(C)(b) (Supp.1999).

**4.** S.C.Code Ann. § 17–25–45(C)(1) and (2) (Supp.1999).

depend upon the jury's finding of at least one statutory aggravating circumstance. If the jury finds a statutory aggravating circumstance, the only sentencing choice to be made is whether to impose the death penalty or life imprisonment without possibility of parole. Should the jury fail to find the existence of a statutory aggravating circumstance, the sentence rests in the discretion of the trial judge. Her choices are life imprisonment, or a mandatory minimum term of at least thirty years. The defendant is parole ineligible in either circumstance.[5]

In my opinion, the unique circumstances of a capital case require that the sentencing authority—whether judge or jury—be fully informed with regard to sentencing options, including the convicted offender's parole ineligibility.

I would hold that where requested by the defense, a properly phrased parole ineligibility charge must be given to the jury in a capital case.

The jury would be instructed that should they find the existence, beyond a reasonable doubt, of one of more aggravating circumstances, there would be but two potential punishments: life imprisonment or the death penalty. The jury would further be informed that life imprisonment means until death, and that the defendant would be ineligible for parole or other early release. This is the charge requested by appellant here.

The jury would also be informed that should it fail to find the existence, beyond a reasonable doubt, of at least one statutory aggravating circumstance, the punishment would be solely within the province of the trial judge. The jury would be told that the sentencing options would be limited to life imprisonment without the possibility of parole, or, assuming the defendant were a non-recidivist, a mandatory minimum of at least thirty years, also without the possibility of parole.

I agree with Justice Blackmun's plurality opinion in *Simmons v. South Carolina, supra*, wherein he discussed the perceptions of most jurors regarding parole:

It can hardly be questioned that most juries lack accurate information about the precise meaning of 'life imprisonment'

---

**5.** § 16–3–20(A) and (C)(b) (Supp.1999).

as defined by the States.... An instruction directing juries that life imprisonment should be understood in its 'plain and ordinary' meaning does nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment'.

*Id.* at 169–70, 114 S.Ct. at 2197, 129 L.Ed.2d at 146. The *Simmons* plurality noted that, at the time it was decided, twenty-six states empowered juries in capital sentencing and provided for life imprisonment without parole as an alternative punishment. Of those states, seventeen required that the jury be expressly informed of the defendant's parole ineligibility. *See id.* at n. 7. The Commonwealth of Virginia recently joined that number with its Supreme Court's decision in *Yarbrough v. Commonwealth*, 258 Va. 347, 519 S.E.2d 602 (1999). In my opinion, this State should likewise adopt the practice.

In its search for an appropriate sentence, the jury should have the benefit of clear and accurate instructions regarding its options. A "plain meaning" instruction does not adequately inform the jury. Without the knowledge that, if aggravators are found, a life sentence is not subject to being reduced by parole, or any other method of early release, the jury is likely to speculate unnecessarily on the possibility of early release, and impose a sentence of death based upon "fear rather than reason." *Yarbrough v. Commonwealth, supra, citing Farris v. Commonwealth*, 209 Va. 305, 307, 163 S.E.2d 575, 576 (1968). A parole ineligibility charge would eliminate any speculation. Since such a charge was not given in this case despite appellant's request, I would reverse the sentence and remand for a new sentencing proceeding.