545 S.E.2d 805

**The STATE, Respondent,**

v.

**Calvin Alphonso SHULER, Appellant.**

No. 25282.

Supreme Court of South Carolina.

Heard March 7, 2001.

Decided April 16, 2001.

Rehearing Denied May 23, 2001.

606

608

Assistant Appellate Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Walter M. Bailey, of Summerville, for respondent.

TOAL, Chief Justice:

Calvin Alphonso Shuler ("Shuler") was sentenced to death for killing guard James B. Brooks ("Brooks") during an armed robbery of an Anderson Armored Car. Shuler appeals his murder conviction and death sentence. This opinion consoli-

dates Shuler's direct appeal with the mandatory review provisions of S.C.Code Ann. § 16–3–25 (1985).

## FACTUAL/PROCEDURAL BACKGROUND

On December 3, 1997, three Anderson Armored Car guards, Alton Amick ("Amick"), Sherman Crozier ("Crozier"), and Brooks, were collecting and delivering money to various banks in the Low County area. Amick was the driver, Crozier sat in the front passenger seat, and Brooks sat in the back of the car.

The Anderson Armored Car is a bullet resistant van with a number of security features. A metal wall topped by a steel mesh screen separated Brooks in the back from Amick and Crozier in the cab. The driver and passenger side doors had "double locks" that take two hands to open. The car's side double doors on the passenger side and double doors in the rear were kept locked. Both Amick and Brooks had keys to access the back of the car, but Brooks did not need the key to get out. Brooks also had access to "kill switches" in the rear—one switch would totally disable the car's engine and the other switch would sound a visual and audible alarm.

At 10:45 a.m., the three guards arrived at First National Bank of Harleyville. Amick looked around twice to see if the area was clear. He opened the door and turned his head to grab his clipboard. When he turned around a man wearing army fatigues, a camouflage face mask, and gloves was pointing a semi-automatic pistol in his face. The attacker also had an assault rifle slung over his shoulder. The attacker shouted three times, "Get out of the God d*mn truck." Amick got out of the car. The attacker then climbed in the driver's seat, pointed the gun at Crozier's head, and ordered him out of the car. Crozier exited the car, but left his door open.

Inside the van, the attacker and Brooks engaged in a gun battle through the screen mesh separating the cab and the rear area. Amick stood near the doorway on the driver's side, Crozier ran around the back of the car. After the gunfire stopped, the attacker threw his semi-automatic handgun out of the car's window. The attacker hesitated for a moment as he tried to get the car into gear, and then drove off at a high rate

of speed. As the van sped away, Amick fired four shots at the car's tires with his .38 revolver.

Several eye witnesses saw the attacker drive the car down Shortcut Road at a high rate of speed. Deputy Thomas Limehouse initially responded to the call from First National Bank, but was told to go to the dirt road in his four wheel drive police vehicle. Once there, he met other policemen, and they proceeded on the dirt road. After about a half mile, they saw the armored car on the road. They approached and saw Brooks laying in the back of the van. EMS responded to the scene, but Brooks was dead due to his numerous gunshot wounds. The rear compartment of the car contained $1,555,400 in currency, although much of it was shredded by gunfire and soaked in Brooks' blood.

Members of the Charleston County Sheriff's canine team responded to the dirt road location to track the attacker. One of the officers found a SKS assault rife, which fires 7.62 mm ammunition, submerged under water in a canal. The SKS's 30 round clip was found on the bank of the canal. The canine team followed the scent from the canal into the surrounding woods. The officers found a bloody ski mask hanging on a tree branch. After another 75 yards, the officers found a box of 7.62 mm ammunition on the ground. The dogs also found a folded green duffel bag before they lost the attacker's scent.

The armored car guards recovered the pink-handled, Lorcin .25 semi-automatic handgun the attacker threw out of the window at the bank. The police traced the gun and found it was registered to Shuler's mother, who is deceased. The police contacted Shuler, and he agreed to meet police at his residence that afternoon. Shuler claimed he gave the gun to his mother for protection. According to Shuler, he had not seen the gun since he gave it to his mother prior to her death.

The SKS rifle was traced to Demond Jones ("Jones"), Shuler's cousin's fiancé. Since Jones was a convicted felon, it was illegal for him to purchase a SKS, and he was arrested on federal firearm charges. Jones testified he agreed to buy the SKS from Woody's Pawn Shop for Shuler in order to satisfy a debt he owed Shuler for a Cadillac. A week after the purchase, Shuler asked Jones to stand guard while he robbed an

armored car in Harleyville. Shuler offered Jones a .44 pistol and $5,000 to help in the robbery. Jones refused.

After further information implicating Shuler was discovered, FBI agents interviewed Shuler concerning the crime. The agent noticed Shuler nervously pulled on his knit hat during the interview. When Shuler's hat was removed, the agent noticed lacerations to the back of his head. A FBI agent then conducted a polygraph examination.[1] Shuler confessed to the murder.

Shuler was a former employee of Anderson Armored Car and had briefly worked with Amick and Brooks. According to Shuler, he knew the guards would be armed, and his .25 pistol would be insufficient firepower, so he gave Jones money to buy the SKS. Shuler's confession revealed he concocted a plan to rob the armored car two weeks prior to the crime. His plan involved hiding underneath a house adjacent to the First National Bank until the armored car made its routine stop. Prior to the murder, Shuler waited patiently underneath the house all night until the armored car arrived the following morning.

Following Shuler's confession, police procured a search warrant for his home. Inside Shuler's home, police found ammunition, Shuler's Anderson Armored Car badge, a pistol pouch, and a .44 magnum pistol in the attic. Inside Shuler's pickup truck they found a pair of camouflage hunting gloves, as well as three other camouflage knit hunting gloves.

The physical evidence overwhelmingly demonstrated Shuler was the attacker. The DNA experts testified at trial Shuler matched the blood taken from the top of the driver's seat and the passenger's sun visor. Shuler also matched blood taken from the outside passenger door handle, the double door on the passenger side of the armored car, the top of the cooler between the seats, the SKS clip found on the bank of a ditch, and the ski mask.

According to the pathologist who conducted Brooks' autopsy, there were three major pre-mortem injuries that could have been fatal. There were also a number of wounds the pathologist theorized were post-mortem. The pathologist

---

1. The polygraph test was not mentioned to the jury.

opined many of the wounds were consistent with injury from a high-powered rifle, and stated all of the shooting happened quickly.

The ballistics expert matched a bullet fragment removed from the right front of Brooks' neck with the SKS rifle. The SKS also matched three fragments from Brooks' right thigh and buttock, and one fragment from his right lateral torso.

Furthermore, a X-ray of Shuler's head wounds indicated the wounds were consistent with gunshot wounds. The ER doctor who performed the X-rays testified the X-rays reflected gunshot fragments in Shuler's head, and Shuler had shoulder bruising consistent with the recoil from a high-powered rifle.

During the January 1998 term, Shuler was indicted for murder, armed robbery, and kidnapping. On January 28, 1998, the State served a notice of intent to seek the death penalty. The jury found Shuler guilty on each count. The penalty stage commenced on November 11, 1998. The jury recommended a death sentence, and the trial judge sentenced Shuler to death.

The following issues are before this Court on appeal:

I. Did the trial judge err in failing to grant *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) relief where he ruled one of the Solicitor's reasons for striking a juror was a "subterfuge" and not race-neutral?

II. Did the trial judge err by proceeding with the *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) hearing in Shuler's absence?

III. Did the trial judge err by allowing the Solicitor to question Jones about his duty to tell the truth pursuant to a plea agreement?

IV. Did the trial judge err in refusing Shuler's Request to Charge on a citizen's use of force in arresting a felon?

## LAW/ANALYSIS

### I. *Batson* Challenge

During jury selection, the trial judge found one of the Solicitor's reasons for striking juror Bettie Dewberry ("Dew-

berry") was a "subterfuge" and not racially neutral. Shuler contends the trial judge should have granted *Batson* relief under this Court's reasoning in *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998). We disagree. The record indicates the trial judge had a flawed memory during the *Batson* hearing concerning Dewberry's earlier answers during individual *voir dire*. Thus, the trial judge's determination that the Solicitor's reason was a subterfuge was clearly erroneous, and the Solicitor's challenged reason for striking the juror was valid.

 The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the striking of a venire person on the basis of race or gender. *State v. Hicks*, 330 S.C. 207, 499 S.E.2d 209 (1998). When one party strikes a member of a cognizable racial group or gender, the trial court must hold a *Batson* hearing if the opposing party requests one. *See generally State v. Haigler*, 334 S.C. 623, 515 S.E.2d 88 (1999). The proponent of the strike must offer a race or gender neutral explanation. *Id.* The opponent must show the race or gender neutral explanation was mere pretext, which is generally established by showing the party did not strike a similarly situated member of another race or gender. Under some circumstances, the explanation given by the proponent may be so fundamentally implausible the trial judge may determine the explanation was mere pretext, even without a showing of disparate treatment. *Id.*

 Whether a *Batson* violation has occurred must be determined by examining the totality of the facts and circumstances in the record. *Riddle v. State*, 314 S.C. 1, 443 S.E.2d 557 (1994). The opponent of the strike carries the ultimate burden of persuading the trial court the challenged party exercised strikes in a discriminatory manner. *State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996). Appellate courts give the trial judge's finding great deference on appeal, and review the trial judge's ruling with a clearly erroneous standard. *State v. Dyar*, 317 S.C. 77, 452 S.E.2d 603 (1994).

 The trial judge's findings of purposeful discrimination rest largely on his evaluation of demeanor and credibility. *Sumpter v. State*, 312 S.C. 221, 439 S.E.2d 842 (1994). Often the demeanor of the challenged attorney will be the best and

only evidence of discrimination, and "evaluation of the prosecutor's mind lies peculiarly within a trial judge's province." *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Furthermore, a strike must be examined in light of the circumstances under which it is exercised, including an examination of the explanations offered for other strikes. *State v. Oglesby,* 298 S.C. 279, 379 S.E.2d 891 (1989).

In many circumstances, attorneys attempt to "save" an unconstitutional peremptory strike by offering another non-discriminatory reason for the strike. However, this Court in *Payton, supra* held a racially discriminatory preemptory challenge in violation of *Batson* cannot be saved because the proponent of the strike puts forth a non-discriminatory reason. According to this Court in *Payton,* if this "dual motivation doctrine" were adopted,

> [T]his Court would be approving a party's consideration of discriminatory factors so long as the sufficient non-discriminatory factors were also part of the decision to strike a juror and the discriminatory factor was not the substantial or motivating factor. However, any consideration of discriminatory factors in this decision is in direct contravention of the purposes of *Batson,* which was to ensure peremptory challenges are executed in a non-discriminatory manner.

*Id.* at 59–60, 495 S.E.2d at 210. This Court concluded that, "[o]nce a discriminatory reason has been uncovered—either inherent or pretextual—this reason taints the entire jury selection procedure." *Id.*

This Court reiterated its rejection of the dual motivation doctrine in *Haigler, supra.* In *Haigler,* this Court applied *Payton* to the defendant's claim one of the prosecutor's two reasons for striking a black female juror was pretextual. According to the prosecutor, the main reason he struck the juror was because she was opinionated and polarizing. His secondary reason was because of her prior jury service on an acquitting jury. The Court found the defendant did not prove a *Batson* violation because the struck juror and a seated juror were not similarly situated because their prior jury service was sufficiently different. Furthermore, the prosecutor's seating of other black jurors weighed against a discriminatory

intent, and the prosecutor's reasons for striking other black females did not indicate discrimination.

Following *voir dire*, the State struck only two venire persons—Bobby Sarine ("Sarine"), an Indian male, and Dewberry, an African American female. With regards to Sarine, the Solicitor noted on the record his observations of Sarine's hesitation, demeanor, and facial expressions when asked whether he could impose the death penalty. After selection, the defense made a *Batson* motion as to the State's strike of Sarine. The Solicitor reminded the trial court he had noted on the record Sarine's equivocation. The Solicitor also stated he was prosecuting Sarine's cousin in a death penalty trial. The trial court ruled that regardless of Sarine's race, the State's reasons were viable, valid, and race-neutral. Shuler does not appeal this ruling.

The State's strike of Dewberry is more complicated. During Dewberry's individual *voir dire*, the trial judge began by explaining the three types of jurors in a death penalty trial—a Type I juror would always give the death penalty, a Type II juror would always give life imprisonment, and a Type III juror would consider giving the death penalty after considering all the evidence. When asked by the trial judge which type of juror she was, Dewberry hesitated. The following colloquy then occurred:

**Court:** Could you ever vote for the death penalty?

**Dewberry:** Yes, sir.

**Court:** All right. **She's indicated a possible two or three.** That's my understanding of your answer. You feel that you might be able to give due consideration and might be able to vote either way; is that right?

**Dewberry:** Yes, sir.

**Court:** But you would lean towards life without parole, correct?

**Dewberry:** Yes, sir.

(emphasis added). This colloquy indicates the trial judge was confused and Dewberry was equivocating. Basically, Dewberry suggests she can vote for the death penalty, but she leans towards voting for life without parole. The trial judge mistakenly states Dewberry is either a Type II or Type III juror, two very different categories. Type II suggests Dewberry

could never vote for the death penalty, while Type III suggests she could consider giving the death penalty in certain circumstances.

Dewberry exhibited further equivocation when questioned by the Solicitor:

> **Solicitor:** Now, I'm not going to ask you to predict what you'd do in this case because you haven't heard the facts, but what we all want to know is if you were picked on a death penalty case like this as a juror, could you ever vote to sentence somebody to death knowing that person is actually going to be executed in the electric chair or by lethal injection because of that jury's vote?
>
> **Dewberry:** (The juror shrugged her shoulders). Yes.
>
> **Solicitor:** All right. And I couldn't help but notice you hesitated for maybe about a minute before answering. I know this is an important question, but do you have—I'm not going to ask you to predict what you would do in this case because you haven't heard the facts, but do you have any doubt as to your ability to fairly consider both alternatives?
>
> **Dewberry:** No, sir.
>
> **Solicitor:** I'm sorry. I couldn't hear you?
>
> **Dewberry:** No, sir.

The audio tapes of Dewberry's *voir dire* reveal her answers to both the trial court's and the State's questions about the death penalty were weak, timid, and almost inaudible. When asked by the State if she could vote for death, there was around a twenty second delay before she answered, and the record reveals she merely shrugged her shoulders. These answers contrast greatly with her answers given in response to the defense's question. When asked general questions about her personal background and her job, Dewberry answered in a normal, audible tone, and she seemed confident.

After Dewberry's *voir dire,* the Solicitor asked the trial court to note her equivocation on the record in the event of a later *Batson* challenge:

> **Solicitor:** In regard to the last juror, again, I agree with the Court's assessment that she is qualified under *Wainwright v. Witt* status. I could not hear her initial re-

sponse to your questions, but you did repeat it. And I just want to check with the court reporter to see if she got all of that down.

And I just wanted the record to reflect that there was—I didn't time it, but a very, very long hesitation where Mrs. Dewberry just stared at me and didn't give the answer for a full minute. She did show—I thought—an undue amount of hesitation on those questions.

**Court:** Uh-huh. All right, let the record so reflect. Yes, sir.

**Solicitor:** Your Honor, the reason I'm doing that is—I can't cite the case. There is a case to that effect that there should be some contemporaneous record made if there was some equivocation or hesitation in the event of a later *Batson* problem.

**Court:** Yes, sir, I understand that.

After the State exercised its second strike on Dewberry, the defense made a *Batson* motion. The trial judge asked the Solicitor for a race-neutral reason for the strike. The Solicitor responded he had two reasons for his strike: 1) Dewberry hesitated when asked about the death penalty; and 2) Dewberry had a prior criminal record she did not report. The primary reason was Dewberry's vacillation or hesitation on the death penalty issue. Acknowledging this could be an appellate issue, the Solicitor cited eight South Carolina cases for the proposition that vacillating responses to death penalty questions are race-neutral reasons for strikes.

The following colloquy then occurred between the Solicitor and the trial judge:

**Solicitor:** Mrs. Dewberry, Your Honor, was the only one of the jurors that ended up on the list that was potentially able to be passed by either side that at any point indicated she was a possible No. 2 juror. She said she was a 2 or 3, I believe.

**Court:** No, sir, she said she was a three from the beginning.

**Solicitor:** All right, sir. Your Honor, I'm just going by my notes and I could be mistaken. I thought she said she was a possible -

**Court:** No, sir. There was a juror but that was not Mrs. Dewberry.

The Solicitor then told the trial judge two members of his staff took notes during the *voir dire* and noted Dewberry's hesitation. The Solicitor also described how he did not strike two African American jurors and one African American alternate because he felt they did not vacillate. Finally, the Solicitor requested the trial judge look at the court reporter's transcript because it appeared there was a discrepancy between the trial court's and the attorneys' recollection.

The trial judge declined to open the record and determined Dewberry said she was a Type III juror from the beginning. The trial court made the following ruling:

**Court:** Now, I'm going to make a ruling right now before we go any further.

I'm finding with regard to whether or not she's responded to the questions adequately, timely and quickly enough is a subterfuge and is not race neutral.

I do find, however, that the fact that she has a record and did not report said record on the questionnaire is a race neutral reason that would disqualify her and allow the strike to stand.

Defense counsel objected.

■ According to this Court's holding in *Payton*, a racially discriminatory peremptory challenge in violation of *Batson* cannot be saved because the State also puts forth a reason that is not discriminatory. *Payton, supra.* Pursuant to *Payton*, if the trial judge erred by failing to quash the jury panel once he found the Solicitor's reason was a subterfuge, Shuler is entitled to a new trial. *See State v. Ford,* 334 S.C. 59, 512 S.E.2d 500 (1999).

■ The trial court's determination the State's reason was a subterfuge and not racially neutral was clearly erroneous. *See Dyar, supra.* A finding is clearly erroneous if it is not supported by the record. *See Haigler, supra.* The record demonstrates Dewberry hesitated when asked about the death penalty. The audio transcript also demonstrates her equivocation, undue hesitation, and uneasy demeanor. South Carolina case law recognizes that vacillating or hesitant responses

by a potential juror on *voir dire* about the imposition of the death penalty is a racially neutral explanation for a peremptory challenge. *See State v. Forney*, 321 S.C. 353, 468 S.E.2d 641 (1996); *Riddle, supra; State v. Elmore*, 300 S.C. 130, 386 S.E.2d 769 (1989).

Furthermore, the trial judge's conclusion Dewberry had always claimed to be a Type III juror was not supported by the record. The trial judge, during individual *voir dire*, stated Dewberry was a Type II or Type III juror who favored life imprisonment. The trial judge's recollection at the *Batson* hearing directly conflicts with his statements during *voir dire*. Immediately after Dewberry's *voir dire*, the trial judge agreed without dispute to let the record reflect her hesitation, but later in the *Batson* hearing the trial judge strongly disagreed Dewberry hesitated at all. The trial judge's recollection was clearly flawed with regards to Dewberry, which is understandable considering the voluminous record and the amount of testimony during individual *voir dire*.

Finally, the composition of the jury panel is a factor that may be considered when determining whether a party engaged in purposeful discrimination pursuant to a *Batson* challenge. *Dyar, supra*. Of the twenty six members of the jury panel in the current case, twenty were Caucasian, four were African American, and two were other minorities. The State struck just two jurors, Sarine and Dewberry. The jury was, therefore, comprised of two African Americans, one other minority, and nine Caucasians. Of the two alternates, one was African American. We find these numbers do not reveal a disproportionate number of Caucasians.

The State had legitimate, non-discriminatory reasons for striking both Sarine and Dewberry. In regards to Dewberry, the trial judge's finding the Solicitor's reason was a subterfuge was not supported by the record, and was clearly erroneous. Because the trial judge's decision was clearly erroneous and the Solicitor's challenged reason is valid, there is no *Batson* or *Payton* violation.

## II. *Jackson v. Denno* Hearing

Shuler argues his Sixth Amendment and Due Process rights were violated by his absence during part of a pre-trial *Jackson*

*v. Denno* hearing on the admissibility of his statements to police and FBI agents. We disagree.

On October 5, 1998, the trial court held a *Jackson v. Denno* hearing on the admission of Shuler's statements and confession. The trial judge required Shuler's presence during the hearing because a *Jackson v. Denno* hearing is part of the "critical process" in preparation for a death penalty case. Before the hearing started, Shuler fought with the guards because he did not want to attend the hearing. Law enforcement agents were forced to restrain Shuler in order to transport him to the hearing. While in transport, the officers had to put a protective mask over Shuler's face to prevent him from spitting on them.

Immediately before the hearing, Shuler severely "rapped" his head on the table. Defense counsel was concerned Shuler suffered a concussion and wanted to call EMS. The trial judge notified EMS and stated, in part:

> Let the record reflect I'm going to go forward regardless of Mr. Shuler's condition at this point in time because even though I find these motion to be a critical part of the trial process and the charges Mr. Shuler is facing, it is necessary for me to go forward.
>
> If in fact Mr. Shuler cannot proceed, I am going to proceed on this discovery type motions. I will certainly move him to a position that's in his best interest both from a security, safety, and medical standpoint.

When asked if he had any objection, defense counsel responded "no," although he did want his client's constitutional rights protected. In other words, he wanted his client to be present during this critical process. The trial judge responded:

> In essence, if we reach that point in time, Mr. Cummings, I will make a ruling on the record regarding his constitutional right to be present, obviously, and whether or not he has intentionally or unintentionally waived that right pursuant to conduct and condition.

At the conclusion of Barbara Walters' expert testimony during the hearing, Shuler was examined by EMS. At the EMS's suggestion, the trial judge ordered guards to strap Shuler to a stretcher and transport him to the hospital because of his elevated blood pressure. The trial court then stated:

Let the record reflect at this point in time, I do not find that his actions are voluntary or involuntary, but there is no critical phase regarding the *Jackson v. Denno* hearing that is being waived.

Therefore, we are going to proceed with the hearing and the motions.

Obviously, if it needs to be repeated at trial, you're going to have to cross the—(Defendant Shuler yelling)—cross the.

We will have to cross that bridge when we get there.

Defense counsel thanked the trial court for removing Shuler, and did not make a contemporaneous objection.

At the conclusion of FBI agent Espie's testimony during the *Jackson v. Denno* hearing, defense counsel stated to the trial court he had no way to present anything to contradict the testimony because Shuler was not present. The trial judge stated:

Now, let the record reflect that the *Jackson v. Denno* hearing is continued for the purposes of allowing the Defense to put forward Mr. Shuler, assuming that they will. I do not believe anything else would be warranted other than Mr. Shuler's testimony, correct?

Defense counsel agreed and stated the defense had no other way to confirm the signature on the confession.

The trial judge noted their objection and found Shuler voluntarily absented himself from the *Jackson v. Denno* hearing. The trial judge also noted Shuler was given the opportunity to testify when he was present on October 18, 1998. According to the trial judge, "Of course, there was ample time and opportunity at that time to present anything else other than Mr. Shuler's testimony vis-a-vis the *Jackson v. Denno* issue. So, I need to simply explain and put that on the record in response to your notation. I note your motion. I note your objection. I note for the record it was timely made and you are protected on the record."

## A. Shuler's Right to Attend the *Jackson v. Denno* Hearing

Shuler argues his Sixth Amendment right to confrontation was violated by his absence from the *Jackson v. Denno* hearing. We disagree.

The primary interest secured by the Confrontation Clause of the Sixth Amendment is the right to cross examination. *Starnes v. State*, 307 S.C. 247, 414 S.E.2d 582 (1991) (citing *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)). The right to confrontation has been referred to as a "trial right." *Id.* (citing *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)). The appropriate question under Confrontation Clause analysis is whether there has been any interference with the defendant's opportunity for effective cross examination at trial. *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). Any questions asked during the *Jackson v. Denno* hearing were presented before the jury at trial when Shuler was present. Therefore, Shuler's right to confrontation was not adversely effected.

Shuler also alleges he had a due process right to be present during the *Jackson v. Denno* hearing because it is a critical stage of the trial. We disagree.

Even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Stincer*, 482 U.S. at 745, 107 S.Ct. at 2667. A criminal defendant has the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure. *Starnes, supra.* A defendant's exclusion, or absence, will be reviewed in light of the whole record. *State v. Caldwell*, 300 S.C. 494, 388 S.E.2d 816 (1990). Both Shuler and the State agree a *Jackson v. Denno* hearing on the admissibility of a defendant's statements is critical to the outcome of the criminal proceeding. However, Shuler's presence would not have contributed to the fairness of the procedure.

First, Shuler was not cooperating with the trial court and was disruptive during the October 5, 1998, hearing. Shuler banged his head on the table prior to the hearing and was wearing a protective mask to prevent him from spitting on the guards. Second, the only prejudice claimed by defense counsel was he could not ask Shuler if the signature on the

*Miranda* form was his. The trial judge held the hearing open to allow the defense to present evidence from Shuler. During that time, defense counsel could have shown the document to Shuler, explained the law enforcement officer's testimony to him, and further interviewed the testifying officer. Finally, Shuler declined to testify or offer any evidence in the *Jackson v. Denno* hearing. Thus, Shuler has not alleged or demonstrated knowledge of any facts not known to his attorneys that would have been relevant to the voluntariness determination. *See Stincer, supra.*

 Finally, a defendant can waive his right to be present at a crucial stage of the trial by disruptive conduct. *State v. Bell,* 293 S.C. 391, 360 S.E.2d 706 (1987). A defendant may be properly excluded when his conduct is disruptive or is interfering with the progress of the trial. *Id.* (citing *In re Dwayne M.,* 287 S.C. 413, 339 S.E.2d 130 (1986)); *see Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (holding defendant waived his right to be present where he continued to behave in a disorderly manner and continued to interrupt the trial judge after he was warned about his conduct). Although the right to be present is a substantial one, no presumption of prejudice arises from a defendant's exclusion. *Bell, supra.* (citations omitted).

 The State argues Shuler's conduct was disruptive because he fought with the guards prior to the hearing, had to be restrained during transport to the court, slammed his head on the table prior to the hearing, and yelled during court. In *Bell,* the defendant waived his right to be present during trial when he stood twice in closing argument, objected to holding trial on the Sabbath, repeatedly interrupted the judge, and told the judge he would insist on obstructing the trial. In *Bell,* we found that even without Bell's candid admission he would impede the trial if he remained in the courtroom, his disruptive conduct clearly constituted a waiver of his right to be present at trial. *Bell,* 293 S.C. at 402, 360 S.E.2d at 712. In this case, Shuler was removed from the hearing because of his elevated blood pressure, which the trial judge concluded was the result of malingering. However, Shuler's pattern of disruptive conduct on the day of the *Jackson v. Denno* hearing is no different than the conduct in *Bell.* The trial judge,

therefore, correctly found Shuler's conduct at the *Jackson v. Denno* hearing disruptive, his mental and physical condition to be the result of malingering, and he voluntarily absented himself from the hearing.

## B. Harmless Error

Although we find Shuler voluntarily absented himself from the hearing, we also find Shuler did not suffer any prejudice as a result of his absence from the *Jackson v. Denno* hearing. His absence was, at most, harmless error.

Denials of a defendant's right to be present, as well as other constitutional violations, are subject to a harmless error analysis. *State v. Williams,* 292 S.C. 231, 355 S.E.2d 861 (1987). Although the right to be present is a substantial right, no presumption of prejudice arises from a defendant's exclusion. *Bell, supra.*

On October 20, 1998, the hearing reconvened and the trial judge advised Shuler of his right to testify during the *Jackson v. Denno* hearing. After explaining the Fifth Amendment ramifications of testifying, the trial judge advised Shuler he had the opportunity to testify to the voluntariness of his statements to law enforcement officers. Initially, Shuler indicated he wanted to testify. Defense counsel then requested an attorney-client conference. When the hearing resumed, Shuler told the trial judge he wanted to exercise his Fifth Amendment rights and did not want to testify.

The trial judge did everything in his power to preserve Shuler's right to be present at the *Jackson v. Denno* hearing. The hearing was held open until Shuler could be present. As discussed above, Shuler exercised his Fifth Amendment right and declined to testify when given the opportunity. He has not alleged either at trial or on appeal any facts not known to his counsel that would have been of consequence in the hearing. Finally, the evidence in this case overwhelming inculpates Shuler. Shuler could have added nothing more at the hearing that was not established by the other evidence presented at trial.

Therefore, we find there is no merit to Shuler's *Jackson v. Denno* argument, and any error was harmless.

## III. Plea Agreement

Shuler argues the trial judge erred by allowing the Solicitor to question the State's witness, Jones, about his plea agreement, which instructed him to testify truthfully in court. Jones was the State's chief witness who testified Shuler knew Brooks would be in the back of the armored car when the robbery occurred. According to Shuler, this testimony was highly prejudicial because it was key to impugning Shuler's statement he was surprised by Brooks' presence. We disagree.

In a pre-trial motion, defense counsel attempted to prevent the Solicitor from bolstering the testimony of Jones, their key witness. The Solicitor noted Jones was testifying pursuant to a federal plea agreement to receive a lighter sentence. The plea agreement contained a provision to tell the truth. According to the Solicitor, if he did not reveal the plea agreement to the jury it would appear they were hiding something. The trial judge agreed but noted neither side could personally vouch for the veracity of the witness in their argument. The Solicitor, therefore, asked Jones if the plea agreement with the United States attorney dropped several pending charges against him. The Solicitor also asked if the plea agreement required him to testify truthfully at trial. Jones responded "yes" to both questions. Jones stated he was testifying truthfully during the current trial.

Defense counsel made two objections to the State's line of questioning regarding Jones' truthful testimony. Defense counsel made the first objection after the State questioned Jones about lying to the FBI when he was interviewed concerning his purchase of the SKS rifle for Shuler. The following occurred on direct examination by the Solicitor:

**Solicitor:** Was that statement to the FBI at that time was that true or a lie?

**Jones:** A lie.

**Solicitor:** The part about where you put the rifle was a lie?

**Jones:** Yes.

**Solicitor:** Why did you lie to FBI on December the 5th?

**Jones:** Because I was scared.

**Solicitor:** Okay. Is what you testified to the jury here today as far as what happened to that rifle the truth?

**Jones:** Yes.

**Defense Counsel:** Objection, Your Honor, that's bolstering the witness.

**Court:** Sustained.

On cross examination, defense counsel repeatedly asked Jones if he made a deal with the United States attorney for his testimony at trial. Defense counsel's cross examination was extensive and focused on Jones' legal troubles and deals with law enforcement. The cross examination effectively impeached Jones by demonstrating he had incentive to testify in order to cut time off of his sentence. Defense counsel characterized Jones' deal with law enforcement as "selling his soul" and "receiving a little carrot" from the State. However, Jones claimed neither the United States attorney nor his attorney promised any reduction in his federal sentence for his cooperation in the case. Defense counsel's cross examination successfully impugned Jones' character by: (1) eliciting Jones had repeatedly spoken with State and federal police officers, but refused to talk with defense investigators; (2) showing Jones was on probation for assault and battery with the intent to kill when he was arrested on federal charges, and he had not had a State probation revocation hearing; (3) demonstrating Jones admitted lying on his federal firearms application for the SKS rifle; and (4) demonstrating Jones had not been charged by the Solicitor in connection with this case, and had not been charged with lying to the FBI.

On re-direct examination, the Solicitor asked Jones if any law enforcement officer asked him to testify to anything that was not true. Defense counsel repeated his earlier objection to this testimony. The Solicitor responded that Jones' credibility had been challenged, and the trial judge overruled defense counsel's objection. The Solicitor then asked Jones four more times if he was telling the truth. Specifically, the Solicitor asked Jones if the plea agreement required him to testify truthfully. Jones claimed it did.

 Initially, it was not error for the Solicitor to introduce the plea agreement on direct examination because the Solicitor was entitled to anticipate the inevitable cross examination of a

federal inmate and to dispel any notion he was hiding something from the jury. Most courts generally recognize the prosecution can introduce evidence of a plea agreement during direct examination of a State witness.[2] However, the Fourth Circuit Court of Appeals has found this freedom is not unlimited. *United States v. Romer*, 148 F.3d 359 (4th Cir.1998) *cert. denied*, 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999). The Fourth Circuit Court of Appeals allows the government to elicit testimony regarding a plea agreement on direct examination only if the prosecutor's questions do not imply the government has special knowledge of the witness' veracity, the trial court gives a cautionary instruction, and the prosecutor's closing argument contains no improper use of the witness' promise of truthful cooperation. *Id.* at 369.

At no point during cross examination or closing argument did the Solicitor imply special knowledge or guarantee Jones' veracity. During direct examination the Solicitor merely asked if a plea agreement existed, he did not go into the details of the agreement until Jones' credibility was severely attacked on cross examination. Although no cautionary instruction was given by the trial judge, the Solicitor did not pursue the plea agreement until re-direct examination.[3]

---

2. *See generally United States v. Spriggs*, 996 F.2d 320 (D.C.Cir.1993) (permitting the prosecution on direct examination to introduce the witness' cooperation agreement in its entirety, and adopting majority rule that admission of plea agreements containing "truthtelling" and perjury provisions did not result in improper bolstering); *Massachusetts v. Rivera*, 430 Mass. 91, 712 N.E.2d 1127, 1132 (1999) ("On direct examination the prosecution may, of course, properly bring out the fact that the witness has entered into a plea agreement and the witness generally understands his obligations under it.").

3. The practice in this situation is for the Solicitor to pose general questions in direct examination to establish the witness knows and understands his obligations pursuant to his plea agreement. The Solicitor should reserve questions intending to elicit the actual nature of those obligations, specifically the obligation to testify truthfully, until the defendant has attacked the witness' credibility on cross examination on the ground his testimony is pursuant to agreements. *See generally Rivera, supra* (finding questions concerning a witness' obligation to tell the truth should await re-direct examination because such procedure would tend to mitigate the appearance of prosecutorial vouching that similar questions on direct might create).

 The Solicitor's questions on re-direct examination do not constitute impermissible bolstering or vouching. A prosecutor cannot vouch for the credibility of a witness by expressing or implying his personal opinion concerning a witness' truthfulness. *Elmer v. Maryland,* 353 Md. 1, 724 A.2d 625 (1999). Improper vouching occurs when the prosecution places the government's prestige behind a witness by making explicit personal assurances of a witness' veracity, or where a prosecutor implicitly vouches for a witness' veracity by indicating information not presented to the jury supports the testimony. *See State v. Kelly,* 343 S.C. 350, 540 S.E.2d 851 (2001); 75A Am.Jur. *Trial* § 700 (1991). Vouching occurs when a prosecutor implies he has facts that are not before the jury for their consideration. *Missouri v. Wolfe,* 13 S.W.3d 248 (Mo.2000).

In *Kelly,* this Court found an assistant solicitor improperly bolstered a witness' credibility through improper questioning. While the assistant solicitor in *Kelly* did not assert he had personal knowledge his witness was testifying truthfully, he improperly phrased his questions in the first person. *Kelly,* 343 S.C. at 369 n. 12, 540 S.E.2d at 861 n. 12. The solicitor asked a witness, *"What did I tell you* that *I* absolutely required regarding your testimony to this jury today?" and "Did *I* tell you to tell the truth to this jury?" *Id.* at 368, 540 S.E.2d at 860 (emphasis added). We found the jury could have perceived the assistant solicitor held the opinion the witness was, in fact, telling the truth. *Id.* at 369, 540 S.E.2d at 861. The witness' testimony, therefore, carried with it the imprimatur of the government, and this bolstering may have induced the jury to trust the State's judgment about the witness. *Id.* The instant case is distinguishable from *Kelly* because the Solicitor did not comment he had personal knowledge Jones was telling the truth. The Solicitor merely asked general questions, not in the first person, about the truthtelling provision in the plea agreement.

A witness' testimony concerning a plea agreement with the prosecution does not necessarily constitute improper vouching. In a recent Missouri case, the Missouri Supreme Court found a prosecutor's questioning of his own witness in a capital murder trial concerning an agreement in which a witness received immunity in exchange for her truthful testimony did

not amount to improper vouching. *Wolfe, supra.* The jury had all the facts about the agreement giving the witness full immunity. Furthermore, the prosecutor never elicited details of the negotiation nor stated the witness' immunity was subject to his independent judgment of whether the witness was telling the truth. *Id.* According to the Missouri Supreme Court, "an immunity agreement not only supports the witness' credibility by showing an interest to testify truthfully, but also impeaches the witness' credibility by showing an interest in testifying favorably for the government regardless of the truth. By the end of [the witness'] testimony, the jury could consider her credibility in light of the agreement." *Id.* at 256 (citations omitted).

In this case, the Solicitor made no overt statement of his personal belief as to the truth of Jones' testimony, and made no insinuation he knew better than the jury what the truth was. "By calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness' veracity." *United States v. Creamer*, 555 F.2d 612, 617–618 (7 th Cir.1977) (citations omitted). Moreover, the Solicitor's questions during re-direct examination which asked Jones if he was telling the truth did nothing more than reference what Jones agreed to do when he was sworn by the clerk before testifying.

Overall, we find no merit to Shuler's argument the Solicitor improperly questioned Jones concerning his plea agreement. The majority of the Solicitor's questions occurred after the defense attacked Jones' credibility. Furthermore, the Solicitor never personally vouched for the truthfulness of Jones' testimony.

## IV. Jury Charge on Voluntary Manslaughter

Shuler argues the trial judge erred in failing to charge the jury on the use of deadly force in an attempt to thwart the commission of a felony, theft, or to apprehend a felon. We disagree.

First, as a matter of law, Brooks' attempt to defend himself and resist Shuler's crimes is not sufficient legal provocation

and does not justify a charge on voluntary manslaughter. Second, there was neither error nor prejudice from the trial judge's refusal to charge deadly force. This case does not involve a citizen's arrest. This case concerns a guard who was trying to defend himself during an armed robbery and kidnapping. Regardless, the trial judge charged the jury that excessive force by a victim during an arrest could constitute sufficient legal provocation for voluntary manslaughter. Had the jury accepted the defense's theory the victim was attempting to arrest Shuler, the jury could have found Shuler guilty of voluntary manslaughter under the trial judge's charge.

## A. Voluntary Manslaughter

The trial judge determines the law to be charged on the presentation of evidence at trial. *State v. Lee*, 298 S.C. 362, 380 S.E.2d 834 (1989). The trial judge must charge the correct and current law of the State. *State v. Hughey*, 339 S.C. 439, 529 S.E.2d 721 (2000) *cert. denied*, —— U.S. ——, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). If there is any evidence to support a charge, the trial judge should grant the request. *State v. Burriss*, 334 S.C. 256, 513 S.E.2d 104 (1999).

Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *State v. Johnson*, 333 S.C. 62, 508 S.E.2d 29 (1998). Both heat of passion and sufficient legal provocation must be present at the time of killing to constitute voluntary manslaughter. *State v. Locklair*, 341 S.C. 352, 535 S.E.2d 420 (2000) *cert. denied*, —— U.S. ——, 121 S.Ct. 817, 148 L.Ed.2d 701 (2001). Provocation necessary to support a voluntary manslaughter charge must come from some act of or related to the victim in order to constitute sufficient legal provocation. *Id.*

A victim's attempts to resist or defend himself from a crime cannot satisfy the sufficient legal provocation element of voluntary manslaughter. In *State v. Tyson*, 283 S.C. 375, 323 S.E.2d 770 (1984), this Court held evidence of a struggle between the victim and defendant during an armed robbery was not enough evidence to warrant a voluntary manslaughter charge. This Court found there was absolutely nothing to support finding sufficient legal provocation at the time of the killing because it was clear the victim was simply

defending himself against an armed robber, and was killed in that attempt. *See also State v. Ivey*, 325 S.C. 137, 481 S.E.2d 125 (1997) (finding voluntary manslaughter charge not required when there was evidence the victim, who was a law enforcement officer, was acting lawfully and had a right to defend himself); *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996) (holding voluntary manslaughter charge not required if victim attempted to grab defendant's gun to resist burglary and armed robbery). Similar to the victim in *Tyson*, Brooks was simply defending himself from an armed robbery and kidnapping when he fired at Shuler. Consequently, there was no sufficient legal provocation, and a charge on voluntary manslaughter was not required.

 Furthermore, there was no prejudice from the trial judge's refusal to charge deadly force because other examples of sufficient legal provocation where charged by the trial judge. The trial court charged the jury:

Certain acts of provocation committed by a victim are sufficient under our law to negate malice and constitute by law sufficient legal provocation.

Some examples are acts which constitute legal provocation, negate malice, legally adequate to reduce the entire act of manslaughter include a threat of imminent danger—imminent deadly assault by the victim upon the defendant, an assault upon the defendant by the victim, *the use of excessive force by the victim to effectuate an otherwise lawful arrest.*

(emphasis added).

Assuming Shuler's theory is true and Brooks was attempting to arrest Shuler, the examples the trial judge provided of sufficient legal provocation would encompass this scenario and the jury could have found voluntary manslaughter.

## B. Shuler's Request to Charge

 At the close of the evidence, defense counsel moved for a directed verdict, arguing the evidence only established voluntary manslaughter because Brooks used excessive force and assaulted Shuler during a citizen's arrest. The trial judge denied the motion, but charged voluntary manslaughter. The trial judge reasoned the jury could find voluntary manslaugh-

ter if they determined the guard fired first. After the charge, defense counsel argued the trial judge should have charged the following:

> Upon view of a felony committed or upon view of a larceny committed, any person may arrest a felon or thief and take him to a judge or magistrate to be dealt with according to law. Such arrest, however, must be made with the use of reasonable force.

> In making an arrest, it is unlawful to use deadly force in an attempt to thwart the commission of the felony or theft or to apprehend the felon.

The trial judge stated it did not find Shuler's charge "to warrant merit under the circumstances and the facts as presented in the trial of this case."

According to the defense, this charge was based on S.C.Code Ann. §§ 17–13–10 to –20 (1976) and *State v. Cooney,* 320 S.C. 107, 463 S.E.2d 597 (1995).[4] In *Cooney,* this Court held it was reversible error not to charge the jury on the common law of citizen's arrest and the use of reasonable force. In that case, two defendants attempted to arrest the victim for robbing their store. The unarmed victim confessed to the robbery and began to flee the scene. The two defendants shot and killed the victim. *Id.* According to the Court, in order to invoke the defense of justifiable killing in apprehending a felon, the defendant, at a minimum, must show he had certain information a felony had been committed and he used reasonable means to effect the arrest. *Id.* at 109, 463 S.E.2d at 599. This Court found whether reasonable force was used to apprehend a fleeing felon is a factual question left to the jury, and the jury should have been charged on the common law of citizen's arrest.

Shuler's argument is without merit because *Cooney* is distinguishable from the instant case. In *Cooney,* the defendant was attempting to argue citizen's arrest as a defense to murder. Moreover, Shuler was the initiator of this crime, and

---

4. Shuler also argues *State v. Linder,* 276 S.C. 304, 278 S.E.2d 335 (1981) in support of his proposition that excessive force in an arrest can result is sufficient legal provocation for voluntary manslaughter. *Linder* is distinguishable because it involved a police officer trying to effect an arrest.

his actions directly put Brooks in danger. No evidence was presented at trial indicating Brooks was attempting an arrest rather than simply trying to protect himself during a robbery and kidnapping. Because there was no evidence to support Shuler's citizens arrest defense, the trial judge did not err in refusing to charge Shuler's Request to Charge.

## CONCLUSION

After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor. Further, the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *See State v. Huggins*, 336 S.C. 200, 519 S.E.2d 574 (1999) *cert. denied*, 528 U.S. 1172, 120 S.Ct. 1199, 145 L.Ed.2d 1103 (2000); *State v. Ivey*, 331 S.C. 118, 502 S.E.2d 92 (1998) *cert. denied*, 525 U.S. 1075, 119 S.Ct. 812, 142 L.Ed.2d 671 (1999); *State v. Hughes*, 328 S.C. 146, 493 S.E.2d 821 (1997). Based on the foregoing, we **AFFIRM** Shuler's convictions and death sentence.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.