565 S.E.2d 281

**Ray GILCHRIST, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 25481.

Supreme Court of South Carolina.

Submitted May 30, 2002.

Decided June 17, 2002.

222

Assistant Appellate Defender Robert M. Pachak, of South Carolina Office of Appellate Defense, of Columbia, for petitioner.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, and Assistant Attorney General Edgar R. Donnald, all of Columbia, for respondent.

Justice WALLER.

We granted a writ of certiorari to review the denial of post-conviction relief (PCR) to petitioner Ray Gilchrist. We reverse.

## FACTS

Gilchrist was convicted of attempted common law robbery and sentenced to 12 years. On direct appeal, the Court of Appeals affirmed. *State v. Gilchrist*, 329 S.C. 621, 496 S.E.2d 424 (Ct.App.1998). As related in the Court of Appeals' opinion on direct appeal, the facts of the crime are as follows:

On November 29, 1995 at approximately 9:00 p.m., Sandra Ginn (victim) was accosted while sitting in her car in the parking lot of Crosscreek Mall in Greenwood. Johnny Ethridge walked up to her window and when she rolled it down slightly, he stuck his hand inside and demanded her billfold. He told the victim he had a gun and would shoot her if she would not give the billfold to him. When she told him she did not have it, he began to choke her and threatened to kill her. She blew her horn in response and he fled. A witness exiting the mall heard the horn and saw a person walk away, and get into a slow-moving, white Mustang. The witness then saw the Mustang speed out of the parking lot.

Shortly after midnight, Gilchrist was stopped while driving a white Mustang and asked to come to the Greenwood police department. Gilchrist admitted to police that he had picked someone up in the mall parking lot. He initially denied knowing the passenger's identity, but then said the passenger's nickname was Mandy or Brushawn. Gilchrist ultimately identified Ethridge from a photo line-up and told the police Ethridge's full name. Gilchrist consistently main-

tained his innocence, denying any part in the attempted robbery. He claimed he first knew of wrongdoing by his passenger when they left the mall parking lot and Ethridge told him what he had done.

Ethridge pleaded guilty to attempted common law robbery and testified on behalf of the state. According to Ethridge, he, Gilchrist, and Gilchrist's cousin, Ervin Hackett, had driven around in Gilchrist's white Mustang. Ethridge was in the backseat. Gilchrist let Hackett out of the car after taking him to his girlfriend's house. Ethridge stayed in Gilchrist's car, getting in the front seat. Ethridge testified Gilchrist then offered him a "hit" of crack cocaine, which he accepted. He had not seen Gilchrist smoke any crack that day and he did not know whether Gilchrist was high or not. According to Ethridge, Gilchrist told him that if they "[made] a lick," they could get some more crack. Ethridge testified a "lick" is a term meaning to "rip somebody off." Gilchrist also said, "Man, we get some more money, we can get some more of that," meaning crack. Although Ethridge did not respond, Gilchrist then drove to the mall.

Gilchrist parked the car in the mall lot and said to Ethridge, "Yo, man, there's one right there," pointing to the victim sitting in her car. Gilchrist then said "Damn man, if we had a gun." Gilchrist got out of the car, opened the trunk, and removed a metal lug wrench. Ethridge also got out of the car and went to the trunk. Gilchrist tried to hand him the wrench saying, "Yo, man, this will work real nice," but Ethridge refused to take it. Ethridge, who was still high from smoking crack cocaine, sat back down in the car for a few seconds, and then went over to the victim's car and attempted to rob her. After she blew the horn, he walked back towards Gilchrist's car, which was beginning to "creep up," and got inside. Gilchrist sped up as he left the mall and he dropped Ethridge near his girlfriend's house.

Gilchrist's testimony contradicted Ethridge's account of the incident. First, Gilchrist said Ethridge got out of the car with Hackett. Gilchrist denied giving him a ride to the mall. Gilchrist said he went to the mall to visit his nephew and ran into Ethridge in the parking lot approximately an hour after he had dropped him off with Hackett. Once he got to the mall, Gilchrist decided not to actually go into the

mall, but agreed to give Ethridge a ride, telling him to meet Gilchrist at the car. Gilchrist denied providing Ethridge with crack, hearing the victim's horn blow, or knowing Ethridge had committed a crime before he picked him up. *State v. Gilchrist*, 329 S.C. at 624–25, 496 S.E.2d 424–25.

During opening argument, the State told the jury it intended to call Ethridge to testify on the State's behalf:

The State will call Mr. Ethridge, who has tendered a plea of guilty to attempted strong-arm robbery. **And I'll say this from the bottom of my heart, that there is one soul, who was at one time unclean and is now clean.** It's that man there with his lawyer. He's clean today, and he will be cleaner still, because he is pleading—he is going to testify in the State of South Carolina's case with no guarantees of sentence for his plea of guilty of attempted strong-arm robbery in this case. He is at the point in his life where he wants to lay all the cards on the table and let the chips fall where they may. **That's good for the soul, and he is looking forward to this. As much as someone tragically is, he's at a point where he wants to be clean. That's really what it's all about. And there will be evidence in this case that Mr. Ethridge is wanting to let it all out. This is his day to let all these things fly. He's beyond that now. Hallelujah.** He's going to tell you that he's a drug addict. He's going to embarrass himself a little bit by laying out a resume of his conduct that pertains to his drug abuse and other misconduct and part of his life, but he will not run from it. He will salute, but he knows he's got a life. He's got a life and he's got a soul. . . .

(Emphasis added). Gilchrist's counsel did not object.

When Ethridge testified, he stated he had smoked crack provided by Gilchrist and, while high on the crack, had committed the attempted robbery at the suggestion of Gilchrist. He acknowledged he had prior convictions for distribution of imitation controlled substances, shoplifting, obtaining money under false pretenses, and forgery. On cross-examination, counsel highlighted how Ethridge had pled guilty to the attempted robbery, but had not yet been sentenced. When asked if he was hoping for leniency, Ethridge responded: "I'm not hoping, I'm praying."

At the PCR hearing, Gilchrist argued that trial counsel was ineffective for failing to object to the State's opening because it constituted impermissible vouching for Ethridge's credibility. Trial counsel testified that he "thought very seriously about making a mistrial motion and objection to all of that at the time. However, based upon the strategy of the case, [he] decided not to." Counsel did not elaborate on what the particular "strategy of the case" was.

As to this issue, the PCR court noted that although the State's opening was "passionate," it was not improper. The PCR court found that: (1) counsel had no reason to object; (2) counsel made a reasonable strategic decision not to object; and (3) there was no prejudice because of the trial court's standard instructions to the jury.[1]

## ISSUE

Was counsel ineffective for failing to object to the State's opening?

## DISCUSSION

■ Gilchrist argues his counsel was ineffective for failing to object to the State's opening comments about Ethridge because they improperly bolstered Ethridge's credibility. We agree.

■ To establish a claim of ineffective assistance of trial counsel, a PCR applicant must show that: (1) counsel's representation fell below an objective standard of reasonableness and, (2) but for counsel's errors, there is a reasonable probability the result at trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Johnson v. State*, 325 S.C. 182, 480 S.E.2d 733 (1997). A reasonable probability is a probability sufficient to undermine confidence in the outcome of trial. *Id.* Where counsel articulates a valid reason for employing a certain strategy,

---

1. For example, the PCR court noted that the trial court's preliminary remarks included that opening statements and closing arguments are not evidence, and the jury charge included instructions on the burden of proof and the juror's oath to base a verdict only on the evidence and the law.

such conduct will not be deemed ineffective assistance of counsel. *E.g., Stokes v. State,* 308 S.C. 546, 419 S.E.2d 778 (1992).

■■■ This Court must affirm the PCR court's decision when its findings are supported by any evidence of probative value. *E.g., Cherry v. State,* 300 S.C. 115, 386 S.E.2d 624 (1989). However, the Court will not uphold the findings of a PCR court if no probative evidence supports those findings. *Holland v. State,* 322 S.C. 111, 470 S.E.2d 378 (1996).

■■■ In *State v. Shuler,* 344 S.C. 604, 545 S.E.2d 805, *cert. denied,* —— U.S. ——, 122 S.Ct. 404, 151 L.Ed.2d 306 (2001), the Court explained that a solicitor:

cannot vouch for the credibility of a witness by expressing or implying his personal opinion concerning a witness' truthfulness.... Improper vouching occurs when the prosecution places the government's prestige behind a witness by making explicit personal assurances of a witness' veracity, or where a prosecutor implicitly vouches for a witness' veracity by indicating information not presented to the jury supports the testimony....

344 S.C. at 630, 545 S.E.2d at 818 (citations omitted). "Because a jury must make its own assessment on the credibility of witnesses, it is inappropriate for the State to assure the jury of a government witness's credibility." *State v. Kelly,* 343 S.C. 350, 369, 540 S.E.2d 851, 861 (2001), *rev'd on other grounds,* 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002).

We hold the State improperly vouched for Ethridge's credibility in its opening statement. We find the following statement made by the solicitor particularly problematic: "And I'll say this from the bottom of my heart, that there is one soul, who was at one time unclean and is now clean." This statement amounts to a personal assurance of Ethridge's veracity because the solicitor emphatically stated that Ethridge was "now clean," i.e., worthy of belief. Since it is inappropriate for the State to assure the jury of a government witness's credibility, Gilchrist's counsel should have objected. *See Shuler, supra; Kelly, supra.* Moreover, the State's abundant use of the religiously-tinged language is also problematic and certain-

ly enhanced the impropriety of the opening statement. The repeated references to Ethridge's soul and his expected testimony as his opportunity to cleanse his soul rise to the level of an assurance of Ethridge's credibility. *See id.*

■ Accordingly, counsel was deficient for failing to object to the opening statement and the PCR court erred in finding otherwise.[2]

■ As to the prejudicial impact of the failure to object, we find that prejudice clearly flowed from counsel's error. In the instant case, Ethridge was the State's key witness, and therefore his credibility was crucial to the government's case. Indeed, because Gilchrist essentially presented a "mere presence" defense, believing Ethridge was the only way the jury could convict Gilchrist.[3] We note further that because of Ethridge's admitted drug use at the time of the crime, his prior convictions, and his interest in providing favorable testimony for the State to obtain leniency in his own case, Ethridge's credibility clearly was questionable.

Accordingly, given Ethridge's obvious credibility problems, and the fact that Gilchrist's conviction is inextricably linked to Ethridge's credibility, counsel's failure to object to the State's improper vouching prejudiced Gilchrist's case.

---

**2.** Although the PCR court found counsel failed to object for strategic reasons, we note counsel never **articulated** any strategy at all. A blanket statement by counsel at a PCR hearing that he employed "strategy" does not automatically insulate the lawyer from being found ineffective. Consequently, there is no evidence to support the PCR court's finding that any valid strategic reason existed for the failure to object. *Holland v. State, supra* (the Court will not uphold the findings of a PCR court if no probative evidence supports those findings); *Stokes v. State, supra* (**where counsel articulates** a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel).

**3.** While other witnesses' testimony placed Gilchrist at the scene (via his white Mustang), and Gilchrist himself admitted to being at the scene, only Ethridge offered direct evidence that Gilchrist aided and abetted the attempted robbery perpetrated by Ethridge, and that the plan for the crime originated from Gilchrist. Moreover, Ethridge's testimony provided the motive for the crime. Thus, Ethridge supplied the testimony necessary to convict Gilchrist.

## CONCLUSION

The PCR court's order denying relief is **REVERSED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.