**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-7**

———————

CALVIN ALPHONSO SHULER,

                              Petitioner - Appellant,

        versus

JON OZMINT, Commissioner, South Carolina
Department of Corrections; HENRY MCMASTER,
Attorney General, State of South Carolina,

                              Respondents - Appellees.

———————

Appeal from the United States District Court for the District of
South Carolina, at Columbia.  Margaret B. Seymour, District Judge.
(3:05-cv-01595-MBS)

———————

Argued: October 26, 2006          Decided: December 11, 2006

———————

Before WILKINS, Chief Judge, and WIDENER and DUNCAN, Circuit
Judges.

———————

Affirmed by unpublished opinion.  Chief Judge Wilkins wrote the
opinion, in which Judge Widener and Judge Duncan joined.

———————

**ARGUED:** Gerald Alan Kelly, Varnville, South Carolina; Francis J.
Cornely, Charleston, South Carolina, for Appellant.  Samuel
Creighton Waters, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA,
Columbia, South Carolina, for Appellees.  **ON BRIEF:** Henry Dargan
McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney
General, Donald J. Zelenka, Assistant Deputy Attorney General,
OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South
Carolina, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

WILKINS, Chief Judge:

Calvin Alphonso Shuler appeals an order of the district court denying his petition for a writ of habeas corpus.[1]  See 28 U.S.C.A. § 2254 (West 1994 & Supp. 2006).  Shuler seeks relief from his conviction and sentence of death for the murder of James Brooks. For the reasons set forth below, we affirm.

I.

At 10:45 a.m. on December 3, 1997, three employees of Anderson Armored Car--Brooks, Alton Amick, and Sherman Crozier--traveled in a company truck to the First National Bank of Harleyville, South Carolina.  Amick and Crozier were in the cab of the truck, while Brooks was in the back.  Upon arrival, Amick opened the driver-side door and was immediately confronted by a man wearing fatigues, a ski mask, and gloves, who was pointing a pistol at him.  An assault rifle was slung over the man's shoulder.

The man ordered Amick and Crozier out of the truck.  He entered the cab of the truck and engaged in a gun battle with Brooks.  After the gunfire stopped, the man threw his pistol out a window and drove away at a high rate of speed.  Shortly thereafter, law enforcement officers found the abandoned truck, with Brooks in the back, dead from multiple gunshot wounds.  Police dogs followed

---

[1]Shuler named Jon Ozmint, Commissioner of the South Carolina Department of Corrections, and Henry McMaster, Attorney General of South Carolina, as Respondents.  For ease of reference, we will refer to Respondents as "the State."

a scent trail from the truck and located an SKS assault rifle, a bloody ski mask, and other items.

Investigation revealed that the pistol was registered to Shuler's mother and that the rifle had been purchased by Demond Jones, the fiancé of Shuler's cousin. Jones had purchased the weapon at Shuler's request, in order to satisfy a debt.

Shuler was questioned and, during a polygraph examination, confessed to the murder. He indicated that he had previously worked for Anderson Armored Car and thus knew how many employees would be in the truck and how they would be armed. He had planned the robbery two weeks in advance and had lain in wait under a house adjacent to the bank.

Upon Shuler's indictment for murder, armed robbery, and kidnapping, Marva Hardee-Thomas was appointed as defense counsel. She contacted Dr. Donna Schwartz-Watts, a forensic psychiatrist. Dr. Schwartz-Watts conducted an evaluation, during which Shuler informed her that he had used anabolic steroids. (Dr. Schwartz-Watts had noticed Shuler's physique and recalled judging him in a previous bodybuilding competition.) Shuler also relayed that he had gotten into a fight with a coworker and had been shot, and that his parents had recently died. Shuler blamed these events on "himself and his steroid use." J.A. 325. Shuler also told Dr. Schwartz-Watts that he had begun using cocaine base shortly before the murder.

4

After Dr. Schwartz-Watts had completed her evaluation, the prosecution filed a notice of intent to seek the death penalty. Because Ms. Hardee-Thomas was not qualified under South Carolina law to serve as counsel in a capital case, Shuler was appointed new counsel, Norbert Cummings and Doyle Mark Stokes. Because Cummings and Stokes were concerned about a "taint[]" from the involvement of unqualified counsel, id. at 875, they elected to engage a new psychiatric expert, Dr. Harold Morgan. However, counsel spoke with Dr. Schwartz-Watts and obtained her report.

Dr. Morgan examined Shuler on several occasions and subsequently testified at a pre-trial competency hearing. Dr. Morgan stated that during his examinations, Shuler claimed to be suffering from total memory loss dating from August 13, 1998, when he knocked his head on a concrete floor as prison guards attempted to subdue him for the purpose of obtaining a blood sample. Based on the symptoms and behaviors exhibited by Shuler, Dr. Morgan concluded that Shuler's memory loss was probably feigned. On cross-examination, Dr. Morgan expressed general agreement with the testimony of prosecution experts that other behaviors exhibited by Shuler--including the recitation of military cadences during examinations and claims of hallucinations--were likely attempts to feign mental illness.

5

Shuler was declared competent and was convicted by a jury of murder, armed robbery, and kidnapping. The jury subsequently imposed a sentence of death.

After Shuler's convictions and sentence were affirmed on appeal, see State v. Shuler, 545 S.E.2d 805 (S.C.), cert. denied, 534 U.S. 977 (2001), Shuler sought post-conviction relief (PCR) in state court. As is relevant here, Shuler asserted first that trial counsel were constitutionally deficient for (a) failing to investigate Shuler's history of steroid use and to present this history, along with testimony regarding the psychological effects of steroid use, as evidence in mitigation; (b) failing to investigate and present evidence in mitigation that Shuler had ingested cocaine base immediately prior to the offense; and (c) failing to inform Dr. Morgan that Shuler had attempted suicide hours before the offense. Second, Shuler maintained that the prosecution knowingly presented perjured testimony by state witness Demond Jones and failed to provide defense counsel with exculpatory information regarding benefits received by Jones in exchange for his testimony. The PCR court denied relief on the merits after an evidentiary hearing.

Shuler thereafter sought federal habeas relief, asserting the claims listed above. The district court denied relief but granted a certificate of appealability. This appeal followed.

6

II.

Shuler first maintains that trial counsel were ineffective in a number of respects with regard to the penalty phase of his trial. In order to establish that his constitutional right to the effective assistance of counsel was violated, Shuler must make a twofold showing. See Wiggins v. Smith, 539 U.S. 510, 521 (2003). First, he must demonstrate that his attorneys' "representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight ... and to evaluate the [challenged] conduct from counsel's perspective at the time." Id. at 689.

Shuler must also demonstrate that he was prejudiced by his attorneys' ineffectiveness, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In the context of an ineffective assistance claim related to counsel's performance during the penalty phase of a capital trial, the question is whether the habeas petitioner can demonstrate a reasonable probability that at least one juror would have voted to impose a sentence of life imprisonment. See Buckner v. Polk, 453 F.3d 195, 203 (4th Cir. 2006).

Review of Shuler's ineffective assistance of counsel claims is additionally constrained by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214. Pursuant to that act, we review the decision of the district court de novo, but we defer to the decision of the state court insofar as it adjudicated Shuler's claims. See Conaway v. Polk, 453 F.3d 567, 581 (4th Cir. 2006). A federal court may grant habeas relief on a claim "adjudicated on the merits" by a state court only if the state court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d).

> A decision is "contrary to" clearly established federal law if it either applies a legal rule that contradicts prior Supreme Court holdings or reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." A decision is an "unreasonable application" of clearly established federal law if it "unreasonably applies" a Supreme Court precedent to the facts of the petitioner's claim.

Buckner, 453 F.3d at 198 (quoting Williams v. Taylor, 529 U.S. 362, 412-13 (2000)) (citation omitted).

With these principles in mind, we turn to an examination of Shuler's claims.

8

## A. Steroid Use

Shuler first maintains that counsel were ineffective for failing to investigate Shuler's use of anabolic steroids. He maintains that such an investigation would have resulted in the development of evidence supporting statutory and non-statutory mitigating factors relating to the drug abuse.

At the PCR hearing, Shuler presented the testimony of Dr. Harrison G. Pope, an expert on the effects of steroid use. Dr. Pope testified that individuals who use large quantities of anabolic steroids, in the manner typical of body builders, often experience mania or hypomania characterized in part by marked irritability and aggression. Although Dr. Pope neither examined Shuler nor spoke with him, he concluded that Shuler was abusing steroids at the time of the crime based on Shuler's admission to Dr. Schwartz-Watts, reports from Dr. Schwartz-Watts and others regarding Shuler's physique, the fact that Shuler had asked his girlfriend, Aleshia Berry, to contact a pharmacist friend for help in acquiring drugs, and a "bizarre" and "aggressive" incident in 1996 in which Shuler held Berry's head under the water in a pool for "an extended period of time." J.A. 869 (internal quotation marks omitted). Dr. Pope identified increasingly aggressive behavior by Shuler, beginning in 1995 when Shuler was involved in a drive-by shooting at his then-workplace and culminating with the robbery-murder for which he had been sentenced to death.

9

Ultimately, Dr. Pope stated his opinion that Shuler's capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the offense (a statutory mitigating factor under South Carolina law) due to steroid use.

Shuler contends, in essence, that competent counsel would have conducted a more thorough investigation of Shuler's steroid use and would have presented the testimony of an expert such as Dr. Pope in order to persuade the jury that Shuler's steroid use was a mitigating factor. In assessing this claim, the PCR court acknowledged the clearly established rule that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691; see id. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

The PCR court found that trial counsel did conduct some investigation into Shuler's use of steroids. In particular, based on their knowledge that Shuler had used cocaine base and steroids, counsel instructed the defense investigator to conduct an investigation into drug use by Shuler (but did not specifically mention steroids). The investigation revealed some casual drug use

10

and that the person suspected to have been Shuler's dealer was deceased. However, the primary focus of the investigation was on finding witnesses who would support counsel's theory of mitigation--that Shuler was a good man and that the crime was out of character.

At the PCR hearing, defense counsel testified regarding their strategy with respect to Shuler's steroid use. Counsel stated that they considered using the evidence but that they decided not to do so because they were concerned that a jury in the conservative county where the case was to be tried would find such evidence aggravating rather than mitigating. Cummings, for example, testified regarding his "reservations about introducing evidence that a healthy, young, grown male self abuses illegal drugs in order to bulk up." J.A. 874 (internal quotation marks omitted). Trial counsel also believed that presenting any evidence regarding mental health issues, such as the psychological impact of steroid use, would open the door to testimony that Shuler had attempted to feign total memory loss, seizures, and hallucinations. Indeed, counsel decided not to present any mental health testimony after Dr. Morgan testified during the competency hearing that he believed Shuler was malingering.

The PCR court concluded that although counsel's investigation into Shuler's steroid use was limited, that limitation was objectively reasonable in light of counsel's strategic judgment

11

that the jury would view such evidence as aggravating, not mitigating. We cannot conclude that this ruling was an unreasonable application of <u>Strickland</u> and <u>Wiggins</u>. Importantly, the only evidence available to counsel indicated that Shuler's steroid use was limited and remote--according to Cummings and Stokes, Shuler informed them only that he had taken some steroid pills during the summer of 1997, and he denied having used steroids near the time of the crime. Furthermore, the investigator uncovered no evidence of extensive drug use, despite speaking with numerous people who knew Shuler well. Counsel thus decided not to present evidence of past voluntary use of a drug when that evidence likely would have had a negative effect on the jury.[2]

### B. Cocaine Base

Shuler next contends that trial counsel were ineffective for failing to develop and present to the jury evidence that he used cocaine base in the hours before the offense. The PCR court found that defense counsel knew before trial that Shuler had used cocaine base and that, based on this knowledge, counsel had directed their investigator to inquire into Shuler's use of drugs. This

---

[2]Although its conclusion that counsel's investigation was not unreasonable was sufficient to dispose of Shuler's claim regarding his steroid use, the PCR court nevertheless continued to the issue of whether Shuler suffered prejudice, and determined that he had not. Because we hold that the ruling of the PCR court with respect to counsel's effectiveness was not unreasonable, we do not consider its decision regarding prejudice.

12

investigation did not reveal anything more than casual use of drugs.

Stokes and Cummings discussed the possibility of introducing evidence of Shuler's use of cocaine base as part of the case in mitigation, but elected not to do so. This decision was driven by the same strategic considerations that animated the decision not to present evidence regarding Shuler's use of steroids: fear that the jury would view casual drug use as aggravating rather than mitigating and concern that any testimony regarding the psychological effects of cocaine use would be countered with potentially devastating testimony regarding Shuler's attempts to feign mental illness.

The PCR court concluded that counsel's strategic decision not to present evidence of Shuler's cocaine use was not objectively unreasonable under the circumstances. We agree with the conclusion of the district court that this ruling by the PCR court was neither contrary to, nor an unreasonable application of, clearly established federal law.

## C. Suicide Attempt

In a report filed shortly after the crime, FBI Special Agent David Espie wrote that "[a]s Shuler contemplated the robbery" while lying in bed during the early morning hours of December 3, "he held the assault rifle that Jones had purchased for [him]; at this time, this rifle was fully loaded.... Shuler placed the barrel of this

13

rifle into his mouth and pulled the trigger." J.A. 770. Unbeknownst to Shuler, the safety was on, and thus the rifle did not fire.

Shuler asserts that trial counsel were ineffective for failing to provide the information in Espie's report to Dr. Morgan and to present it to the jury. The PCR court rejected these claims, first finding as a fact that trial counsel did inform Dr. Morgan of the suicide attempt, although they may have done so orally rather than by providing Dr. Morgan with a copy of Espie's report. Shuler does not contend that this finding is unreasonable in light of the evidence presented during the PCR hearing, nor could he credibly do so.

Second, the PCR court concluded that it was not unreasonable for counsel to fail to present the suicide attempt to the jury. In the view of the PCR court, mere presentation of the attempt (e.g., by seeking admission of Espie's report) would have been insufficient, standing alone, to justify a jury instruction on the statutory and nonstatutory mitigating factors that Shuler alleges are supported by the suicide attempt. Thus, presentation of psychological testimony would have been necessary, with the result that the door would be opened to evidence regarding Shuler's malingering. The PCR court therefore concluded that counsel's failure to present the suicide attempt to the jury was not objectively unreasonable "[i]n light of the obvious negative

14

aspects of possible rebuttal evidence that [Shuler] was malingering." Id. at 892 (internal quotation marks omitted). We conclude that the ruling of the PCR court that counsel were not ineffective regarding Shuler's suicide attempt was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

The PCR court further concluded that even if the failure to present this evidence was ineffective, Shuler could not demonstrate prejudice. We hold that this ruling also was not unreasonable. Counsel's mitigation strategy was to present Shuler as a good man who had made a terrible mistake. As part of this strategy, counsel presented testimony regarding Shuler's reaction to his parents' deaths. Various witnesses testified that Shuler was deeply depressed following his parents' deaths; this testimony included a statement that "all the life went out" of him after his parents' passing. Id. at 271. His aunt testified that on one occasion she found Shuler in the cemetery, lying between his parents' graves. In short, the jury was fully aware of Shuler's depression at the time of the crime. The jury also knew that the crime took place on December 3, which was both Shuler's birthday and the anniversary of his mother's burial. While evidence of a suicide attempt would have provided an additional piece of the puzzle, we cannot say that the PCR court unreasonably applied the prejudice prong of Strickland when it concluded that Shuler had failed to demonstrate a reasonable probability that, absent counsel's failure to present

15

the evidence, at least one juror would have voted to impose a life sentence.

## III.

Finally, Shuler raises two claims related to the testimony of Demond Jones.  First, he maintains that the prosecution knowingly allowed Jones to testify falsely regarding his plea agreement with the federal government.  See Napue v. Illinois, 360 U.S. 264, 269 (1959).  Second, Shuler claims that the prosecution failed to produce evidence regarding a particular aspect of the agreement, namely, that Jones would be incarcerated in South Carolina.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  We affirm the denial of relief as to both of these claims.

### A.  Napue Claim

A conviction acquired through the knowing use of perjured testimony by the prosecution violates due process.  See Napue, 360 U.S. at 269.  This is true regardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected.  See Giglio v. United States, 405 U.S. 150, 153 (1972); Napue, 360 U.S. at 269.  The Supreme Court has held that a defendant is entitled to relief on such a claim when "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  Kyles v. Whitley,

16

514 U.S. 419, 433 n.7 (1995) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).

Because Jones was a convicted felon, it was illegal for him to possess the SKS rifle he purchased for Shuler. He was charged with several federal offenses in connection with his purchase of the weapon. Jones pleaded guilty to a single offense and was sentenced to 41 months imprisonment. However, the plea agreement provided that the United States would seek a sentence reduction pursuant to Rule 35 of the Federal Rules of Criminal Procedure if Jones "cooperate[d] pursuant to the provisions of this Plea Agreement, and that cooperation is deemed by Attorneys for the Government as providing substantial assistance in the investigation or prosecution of another person who has committed an offense." J.A. 863.

During cross-examination, Shuler unsuccessfully attempted to elicit Jones' acknowledgment of this provision of the plea agreement:

> Q.   ... they have a right to reconsider your sentence, the United States Attorney ... can go back and ask Judge Norton to give you a reduction under the rules as part of its plea agreement; isn't that correct?
>
> A.   I'm not promised nothing.
>
> ....
>
> Q.   You signed a plea agreement with the United States Government .... This is an original file[d] back on April 8, 1997, where you agreed to plead guilty. I want you to please take a look at it and see if you can identify it?

17

        A.    Yes, sir.

        ....

        Q.    They agreed to drop certain counts of the indictment, certain charges, everything else if you agreed to come to this courtroom today and testify as you're testifying, right?

        A.    Right.

        Q.    Okay.

        And I'm asking you under oath this morning: Were you not told by either the United States Attorney or your lawyer ... that if you testified here they would have the right to come back and seek a reduction under the rules of federal court for you if you testified in this hearing today?

        A.    No.

        Q.    They did not tell you that?

        A.    I ain't promised nothing.

        Q.    You['re] understanding you're under oath?

        A.    I'm right.

        Q.    You're as sure of that last statement as you are about ... every other piece of testimony you testified to for the State, are you not, sir?

        ....

        A.    I wasn't promised anything.

Id. at 202-04.

Shuler maintains that Jones' testimony was false, in that he claimed not to be aware of the possibility of a Rule 35 motion, and that the prosecution violated Napue by allowing this false testimony to pass uncorrected. The PCR court concluded, and we

18

will accept for purposes of analyzing this issue, that Jones' testimony on this point was incorrect because the Government had promised that it would seek a reduction in Jones' sentence if he testified truthfully at Shuler's trial, although the plea agreement noted that the district court would not be bound to grant such a motion. However, the PCR court concluded that relief was not warranted because the jury was made aware, through questioning by the prosecution and Shuler, of the nature of Jones' agreement and because the inaccurate testimony was not material in light of the "vehement attack" on Jones' credibility:

> [D]efense counsel's cross-examination successfully impugned Jones' character by: (1) eliciting Jones had repeatedly spoken with State and federal police officers, but refused to talk with defense investigators; (2) showing Jones was on probation for assault and battery with the intent to kill when he was arrested on federal charges, and he had not had a State probation revocation hearing; (3) demonstrating Jones admitted lying on his federal firearms application for the SKS rifle; and (4) demonstrating Jones had not been charged by the Solicitor in connection with [Shuler's] case, and had not been charged with lying to the FBI.

Id. at 901 (internal quotation marks omitted).

We agree with the district court that the analysis of the PCR court was neither contrary to, nor an unreasonable application of, the principles set forth in Napue. Accordingly, we affirm the rejection of this claim by the district court.

## B. Brady Violation

Shuler makes a second claim related to Jones' testimony, namely, that the prosecution failed to reveal to the defense that

19

Jones was promised that he would be incarcerated in South Carolina in exchange for his testimony and that he would receive drug treatment. The claim regarding incarceration is based on a letter from the Assistant United States Attorney in Jones' case to Shuler's prosecutor. The letter stated, in relevant part,

> Judge Norton ... indicated that he would recommend that Jones be designated to the federal prison in Estill which should be relatively convenient for trial preparation. Judge Norton said that if there are any difficulties with your having access to Jones for trial preparation, or at such time as you need him transported for trial, he will be glad to assist by issuing the appropriate orders at my request.

J.A. 834-35. Shuler also notes that during Jones' sentencing hearing, Jones' counsel requested that his client be assigned to the federal penitentiary at Estill.

The PCR court found as a fact that there was no "deal" with Jones regarding his place of incarceration; rather, the letter cited by Shuler indicated an attempt to ensure that Jones, a key witness against Shuler, would be readily available for trial preparation. This finding is not unreasonable in light of the evidence presented to the PCR court.

Because the PCR court was concerned about the appearance that "Jones' counsel had a 'say' in Jones' penal destination," id. at 905, the court additionally considered whether the failure to divulge the purported "deal" was material. The PCR court concluded that the evidence was not material in light of the extensive impeachment of Jones (detailed above) and the extensive evidence of

20

Shuler's guilt, which included his confession.  This conclusion was not an unreasonable one, and we affirm the denial of this claim by the district court.

## IV.

For the reasons set forth above, we affirm the denial of habeas relief by the district court.

AFFIRMED