# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Justin Ryan Hillerby, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2016-001666

---

## ON WRIT OF CERTIORARI

---

Appeal From Berkeley County
Larry B. Hyman, Jr., Circuit Court Judge

---

Opinion No. 5767
Submitted June 1, 2020 – Filed August 19, 2020

---

## AFFIRMED

---

Appellate Defender Taylor Davis Gilliam, of Columbia,
for Petitioner.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia, for Respondent.

---

**HEWITT, J.:** In February 2010, a jury convicted Petitioner of homicide by child abuse. The trial court sentenced him to life imprisonment without the possibility of parole. This court affirmed Petitioner's conviction and sentence on direct appeal. *State v. Hillerby*, Op. No. 2013-UP-300 (S.C. Ct. App. filed July 3, 2013).

Petitioner subsequently filed an application for post-conviction relief (PCR), which the PCR court denied.  Petitioner then sought a writ of certiorari, which this court granted as to the issue of whether trial counsel was ineffective for not consulting with a forensic pathologist and presenting a pathologist's testimony at trial. *Hillerby v. State*, S.C. Ct. App. Order dated Feb. 6, 2019.

We affirm the PCR court's denial of relief.  Petitioner made multiple incriminating statements that were introduced at trial.  One was so damaging trial counsel called it an outright "confession."  As the PCR court found, we find there is not a reasonable probability the trial's result would be different even if the pathology evidence from the PCR hearing had been part of the original case.

**FACTS**

This case arises out of the death of a twenty-two-month-old child (Victim).  At the time of the incident, Petitioner was living, on and off, with Victim's mother (Mother), Mother's eight-year-old daughter (Daughter), and a couple who rented a room from Mother.  The day before Victim was found deceased in his crib, Mother and Petitioner took Victim and Daughter to the neighborhood pool.  They spent that day drinking with friends at the pool.

Two teenagers at the pool that day testified Victim was not properly supervised.  For example, these teenagers pulled Victim—a toddler—out of the pool on multiple occasions after he jumped in the pool's deep end.  On one such occasion, one of teenagers recalled Petitioner saying "you should have just kept him in there."  This same witness also observed Petitioner yell at Victim, "yank" Victim's arm, and tell Victim to "stand in the corner because nobody cares about you."

After leaving the pool and returning to Mother's house, Mother went out drinking with friends while Petitioner watched Daughter and Victim.  Mother left after 7:00 p.m.  She testified that Victim was eating in his highchair when she left, he looked fine, and he was acting normally.

The couple renting a room from Mother arrived home around 7:00 p.m. and spent the remainder of the evening in their room watching television and sleeping.  One roommate recalled that Daughter was in her room when they arrived at the house and that Victim seemed okay but looked exhausted from being at the pool all day.

Mother arrived home at 1:00 a.m. and was intoxicated.  She found Petitioner asleep on the couch and then went into her bedroom and looked at the baby monitor to

check on Victim. She did not go into Victim's room. Mother then went into the roommates' room and argued with them about rent before getting into bed with Petitioner and going to sleep. Mother woke up around 6:15 a.m. the next day to get Daughter ready for school. After Daughter left, Mother went back to sleep.

Mother testified that when she and Petitioner got out of bed at 10:00 a.m. she realized Victim was not awake. When Mother opened the door to Victim's room to check on him, Petitioner told her to let Victim keep sleeping and to leave the door open so Victim could wake up on his own. Mother went to Victim's crib after she noticed something on Victim's face when she started to leave Victim's room. She became hysterical after finding Victim cold to the touch and stiff "like a board." Petitioner called 911 and emergency personnel verified Victim was deceased.

Petitioner gave several statements to police. Initially, he denied ever striking Victim. In a second statement, he told police he inadvertently hit Victim's head on a door frame and on the crib when putting Victim to bed and that earlier in the evening Victim's head collided with Petitioner's knee as the boy ran toward Petitioner, causing Victim to fall to the floor.

In his third and final statement to police, Petitioner stated he "smacked" Victim open-handed "a couple of times" after Victim spilled Petitioner's drink. Petitioner said this knocked Victim off his feet and caused Victim to hit his head on the floor. Petitioner told police that Victim looked like he was falling asleep after this, so Petitioner put Victim to bed.

Petitioner's third statement to police was similar to a statement he made to Mother during a phone call from jail following his arrest. There, in response to Mother's question about what had happened, Petitioner answered "Baby, I smacked him, I didn't smack him that hard, but when he hit the floor is when, I guess, it started. And, I didn't notice it because I was drunk, I guess. And, I put him on the futon."

At trial, Petitioner denied ever hitting Victim and claimed he only told Mother he smacked Victim in order to be consistent with the statement he gave to police. Petitioner testified his statements to police were prompted by the officers telling him repeatedly that people did not get in trouble for accidental deaths. One of the officers who questioned Petitioner admitted, during a *Jackson v. Denno* hearing, that police told Petitioner this may have been an accident and that he could not get in trouble for an accident. The trial court found Petitioner's statements were voluntarily, knowingly, and intelligently given.

Dr. Nicholas Batalis, the forensic pathologist who performed Victim's autopsy, testified that Victim died of "blunt head trauma" and that the manner of death was homicide.  Dr. Batalis believed Victim died during a window of two to twelve hours before he was found.  Dr. Batalis testified Victim had twenty-three injuries to his head including twelve bruises on his face, two scrapes on his face, and nine injuries to his skull which resulted in hemorrhaging around the brain.  Dr. Batalis opined Victim could have been hit with a book or a fist, or could have been pushed against something causing his head to strike a doorway or a desk.

Dr. Batalis did not believe the injuries on Victim's skull could have been sustained by falling down or bumping into things while playing because the injuries were more severe than "normal wear and tear" and because there were so many different impact sites.  Dr. Batalis explained that Victim's injuries would have immediately been symptomatic and Victim would have appeared sleepy and groggy.

On cross-examination, trial counsel asked Dr. Batalis about autopsy photographs showing what appeared to be small areas of circular discoloration on Victim's legs, arms, and torso.  Dr. Batalis testified he initially believed these were bruises but that he found no fresh blood beneath the areas when he cut into them, leading him to believe these marks were instead caused by a skin condition or by the body's storage after the Victim's death.  Dr. Batalis explained he did not cut into every one of these marks on Victim's body, but instead incised a representative sample and concluded none of the marks were bruises.

The jury asked during deliberations to hear the recording of Petitioner's phone call to Mother from jail in which Petitioner admitted striking Victim.  The jury returned a guilty verdict approximately forty minutes later.

At the PCR hearing, Petitioner presented the testimony of Dr. Michael Myer Baden, a forensic pathologist who formerly worked as the Chief Medical Examiner of New York City and as the Chief Forensic Pathologist for the New York State Police.  It does not appear to be contested that Dr. Baden's credentials are impeccable.  Dr. Baden testified he had performed over 20,000 autopsies and was the forensic pathologist charged with reinvestigating the deaths of President John F. Kennedy, Dr. Martin Luther King Jr., and many other prominent figures.  Dr. Baden reviewed Victim's autopsy report, autopsy photographs, X-rays, and Dr. Batalis's trial testimony.  Dr. Baden offered his opinion, to a reasonable degree of medical certainty, that Victim died of more than fifty blunt force impact injuries to the head, face, legs, and back, which he believed were caused by a narrow object.

Dr. Baden explained that he had seen similar injuries on babies who had been poked with toys or objects and such injuries did not occur when an adult "beats up" a child, usually with their hands, fists, or by banging the child against furniture. Dr. Baden explained Victim's injuries resembled those from "sibling rivalry-type deaths," in which an older child uses a toy or stick to injure a baby. Dr. Baden said he would have expected to find skull fractures if an adult had beaten Victim as well as injuries to internal organs and broader bruises rather than small blunt force impacts on the whole body. Dr. Baden explained that the marks were too narrow to be from a fist or a slap, and he had never seen such injuries in a child who had been abused by an adult.

Dr. Baden disagreed with Dr. Batalis's testimony about the circular areas of discoloration on Victim's body and concluded that these injuries were, in fact, bruises consistent with Victim being poked by a long stick-like object. Dr. Baden believed Dr. Batalis should have cut into all of these marks and looked at the tissue under a microscope. Dr. Baden explained that bruises sometimes do not go deeper than the skin's interior layer and this can only be determined with a microscope. Dr. Baden further testified that the body being placed in a cooler "absolutely would not cause" these marks and they were not caused by any skin disease. Dr. Baden opined that an object similar to a paint roller found near Victim's crib could have caused Victim's injuries.

Dr. Baden also disagreed with Dr. Batalis regarding the time of death, explaining it would have taken at least eight hours for Victim's body to develop stiffness. This put the time of death between eight to twelve hours before Victim's body was found rather than two to twelve hours, as Dr. Batalis had testified.

Petitioner also presented the testimony of a private investigator at the PCR hearing who testified that Dr. Batalis was not certified in forensic pathology until twelve days before he performed Victim's autopsy.

Petitioner testified that trial counsel claimed he would have an expert look over the medical evidence and Petitioner had indeed wanted counsel to consult with a medical expert. Petitioner's mother also testified trial counsel said he was going to have a forensic pathologist go over the autopsy report. As the case developed, Petitioner said trial counsel relayed that he had talked to an expert but did not like what the expert said. Petitioner said he was surprised there was no defense expert at trial.

Trial counsel consulted an expert but decided not to call her as a witness. He consulted Dr. Betsy Gibbs, a pediatrician who ran a clinic for sexually and physically abused children. Dr. Gibbs would have disagreed with Dr. Batalis and testified that the circular marks on Victim's body were indeed bruises rather than marks from the body being placed in storage or the result of a skin condition. Trial counsel decided against calling Dr. Gibbs after Dr. Gibbs told him she believed Petitioner killed Victim.

Trial counsel acknowledged during the PCR hearing that Dr. Gibbs was not a forensic pathologist and that he did not consult with a forensic pathologist. He also acknowledged that Dr. Gibbs had disagreed with the State's expert and believed all of the marks on Victim's body were injuries. Still, trial counsel explained he did not see why that difference of opinion amounted to much because any bruising could have come from Victim being poorly supervised at the pool as well as from Petitioner striking Victim and knocking Victim to the floor.

Trial counsel believed the recorded conversation between Petitioner and Mother was what ultimately led to Petitioner's conviction. Trial counsel said "I mean, it's a confession. . . . That's what got him convicted." After trial counsel heard the recording he advised Petitioner and Petitioner's mother that Petitioner needed to cut a plea deal. According to trial counsel, Petitioner's mother responded "I didn't pay you to plead this case. We paid you to take this case to go to trial and we want a trial."

The PCR court found trial counsel was not ineffective for failing to consult with a forensic pathologist. The court employed a two-step analysis, but it was not the traditional assessment of deficiency and prejudice. Instead of deficiency, the PCR court determined Dr. Baden's testimony was not credible.

The court gave four reasons for its credibility finding. First, the court noted Dr. Baden never performed an autopsy on Victim and relied only on photographs and reports years after the autopsy was performed. Second, the court found Dr. Baden's testimony that Victim's injuries were caused by poking was "simply not plausible based on the evidence in the case." Third, the court characterized Dr. Baden's opinion that the bruises were caused by an object such as the paint roller as "based on complete speculation" since "no DNA testing was completed on the paint roller, and there were no witnesses that the paint roller was ever used in the child's death." Finally, the court found Dr. Baden's testimony that Victim's death could not have occurred within two hours of his discovery did not materially differ from the testimony the State's expert offered at trial. The court concluded its

deficiency analysis by noting that Dr. Batalis and Dr. Baden both agreed Victim's death was caused by blunt force trauma to the head.

As to prejudice, the PCR court found Petitioner failed to prove that the outcome of trial would have been different because he presented "no evidence whatsoever at the PCR hearing that anyone other than [Petitioner] injured the child." The PCR court also found Petitioner failed to demonstrate prejudice because he admitted to smacking Victim in the recorded conversation with Mother and made a similar statement to law enforcement.

## ISSUE ON APPEAL

Whether trial counsel was ineffective in failing to consult with a forensic pathologist and present testimony from a forensic pathologist?

## ARGUMENTS

Petitioner argues trial counsel was deficient for not consulting with a forensic pathologist or offering any expert testimony to rebut the State's medical expert. He contends the PCR court erred in failing to address whether this was indeed deficient instead of assessing Dr. Baden's credibility. Petitioner argues he was prejudiced because without an expert witness rebutting Dr. Batalis's testimony, the State's medical evidence went totally unchallenged.

The State argues Petitioner has not shown deficiency or prejudice. On deficiency, the State argues there is no disputing counsel consulted with an expert—Dr. Gibbs—and made a strategic decision to challenge the State's medical evidence with cross-examination after Dr. Gibbs indicated her testimony would not be favorable. On prejudice, the State contends there was overwhelming evidence of guilt.

## APPLICABLE LAW

"In [PCR] proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). A reviewing court defers to the PCR court's factual findings and will uphold them "if there is any evidence of probative value to support them." *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016). We review questions of law *de novo*. *Id.*

To receive relief, a PCR applicant must show trial counsel was deficient and that counsel's deficiency caused prejudice. *Strickland v. Washington*, 466 U.S. 668, 690–93 (1984). Deficiency is judged by whether trial counsel failed to provide "reasonably effective assistance" under "prevailing professional norms." *Id.* at 687–88. There is a strong presumption that counsel was not deficient and exercised reasonable professional judgment. *Caprood v. State*, 338 S.C. 103, 109, 525 S.E.2d 514, 517 (2000), *abrogated on other grounds by Smalls v. State*, 422 S.C. 174, 810 S.E.2d 836 (2018). "Where counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel." *Gilchrist v. State*, 350 S.C. 221, 226–27, 565 S.E.2d 281, 284 (2002). However, "strategic choices made by counsel after an incomplete investigation are reasonable 'only to the extent that reasonable professional judgment supports the limitations on the investigation.'" *McKnight v. State*, 378 S.C. 33, 45, 661 S.E.2d 354, 360 (2008) (quoting *Von Dohlen v. State*, 360 S.C. 598, 607, 602 S.E.2d 738, 743 (2004)). We must make "every effort . . . to eliminate the distorting effects of hindsight" and we endeavor "to reconstruct the circumstances of counsel's challenged conduct[] and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 102 (2013) (quoting *Strickland*, 466 U.S. at 694). A reasonable probability of a different result does not exist when there is overwhelming evidence of guilt. *Geter v. State*, 305 S.C. 365, 367, 409 S.E.2d 344, 346 (1991).

We do not have to examine both deficiency and prejudice in every case. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

**ANALYSIS**

We begin by noting our concern with the deficiency examination in the PCR court's order. The key question for deficiency is whether trial counsel's representation fell below prevailing professional norms. Deficiency does not turn on an expert witness's "credibility." Though there may well be instances causing a PCR court to reject testimony—even expert testimony—as patently unbelievable, the PCR court acknowledged Dr. Baden's impressive credentials.

We nevertheless see sufficient evidence in the record to affirm the PCR court's finding that Petitioner failed to demonstrate prejudice. The PCR court found Petitioner failed to demonstrate prejudice because he admitted to smacking Victim in a recorded conversation with Mother and made a similar statement to law enforcement. We agree with the PCR court that Petitioner's admissions, in conjunction with the evidence presented at trial, constitute overwhelming evidence of guilt. *See Geter*, 305 S.C. at 367, 409 S.E.2d at 346 (stating a reasonable probability of a different result does not exist when there is overwhelming evidence of guilt).

As we noted earlier, Petitioner gave a series of statements to law enforcement. He first denied any part in injuring Victim. In his second statement, he claimed he might have done so inadvertently. In his third statement, however, Petitioner admitted striking Victim with an open hand. He admitted to multiple strikes, all over Victim's head, and said the final blow knocked Victim to the ground and caused Victim's head to hit the floor. We acknowledge Petitioner recanted this statement, but that was after he made a similar admission to Mother in a phone call from jail.

The phone call from jail was particularly incriminating. Victim's mother directly asked Petitioner "what happened" and Petitioner immediately responded that he had "smacked" Victim. On the same call, Petitioner told Mother his third statement to law enforcement—the statement admitting intentional strikes all over Victim's head—was "true." Petitioner told Victim's mother he had been assaulted by other inmates after they learned of Petitioner's confession via the news.

As we noted at the beginning, trial counsel testified at the PCR hearing that he believed the recording was the critical piece of information that led to Petitioner's conviction. Counsel explained he originally thought the case was winnable because nobody could offer a solid explanation of how the child died and who could have done it. After he heard the phone call from jail, however, counsel assessed "we're done, we're finished. We got no -- I mean, it's a confession."

It is likely the atmosphere at trial would have been different if a forensic pathologist testified in the way Dr. Baden testified at the PCR hearing. But saying the atmosphere would be different is not the same as saying there would have been a different result. Petitioner's own statement was that *he* beat Victim, and thereafter Victim began showing the very symptoms Dr. Batalis said would follow from blunt head trauma. Additionally, there was no evidence presented at trial that Victim's sister was ever hostile to Victim. There was also quite a lot of other

incriminating evidence including the testimony about Petitioner's neglectful and rough supervision at the pool and other witnesses describing Petitioner's behavior as suspicious after Victim's body was discovered.

We therefore agree with the PCR court and find it is not reasonably likely that the result of the proceedings would have been different even if the pathology evidence from the PCR hearing had been part of the original case.

**CONCLUSION**

For the foregoing reasons, the PCR court's denial of Petitioner's application is

**AFFIRMED.**[1]

**LOCKEMY, C.J., and GEATHERS, J., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.